THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RICKY
HILL, Defendant-Appellant.

First District (4th Division)   No. 1—92—1837

Opinion filed May 4, 1995.

CAHILL, J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Ira Churgin, Assistant Public
Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine
Cook, and Linda J. Jakubs, Assistant State's Attorneys, of counsel), for the
People.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

Ricky Hill was indicted on three counts of first degree murder and one count of robbery for the death of Edwin Nowak. On March 27, 1992, after a second trial, a jury convicted Hill of first degree murder and robbery. The court sentenced him to 32 years in prison for murder and a concurrent sentence of seven years for robbery. The defendant now appeals and we address the following issues: (1) whether the trial court erred by not suppressing a statement which resulted from the detention and interrogation of a citizen when the State conceded that probable cause to arrest did not exist until the defendant implicated himself in the crime; (2) whether the trial court erred in admitting other crimes evidence; and (3) whether Hill's sentence was excessive. We affirm.

Hill filed a pretrial motion to suppress a statement he made to the police on January 19, 1990. At the hearing on the motion, Chicago police officers Anthony Wojcik and Diego Flores testified that while on patrol at around 1 p.m. on January 18, 1990, some 19 months after the crime, they saw Hill walking on North Hoyne Street in Chicago. At the time, the officers had information that Hill knew something about the robbery and murder of Edwin Nowak.

Wojcik and Flores testified that Hill, whom they knew, approached their squad car when they called out to him. Hill told them that he knew nothing about the robbery. Both officers testified that Hill agreed to ride with them to the fourteenth district station to talk with detectives. The officers testified that they did not handcuff or search Hill.

Chicago police detectives Bernard Brennan and John Boyle testified that they went to the fourteenth district station on January 18, 1990, after learning from Officer Wojcik that he had located a witness to a homicide. Detective Brennan testified that they arrived at the fourteenth district station between 2 and 2:30 p.m. and talked briefly with Hill. In this conversation, Hill described a homicide he had seen. Brennan and Boyle testified that they were unfamiliar with the circumstances of the homicide Hill said he witnessed, which required a return to Area Five headquarters to research the case.

Brennan and Boyle testified that Hill agreed to accompany them to Area Five and they transported him in their squad car at about 2:30 p.m. At Area Five, Brennan and Boyle located a file with incidents similar to those Hill described at the fourteenth district station. Brennan and Boyle testified that at no time was Hill handcuffed. They spoke to Hill in an interview room for about an hour.

Brennan testified that Hill's account contained "minor discrepan-

cies." Hill agreed to take a polygraph test at police headquarters. As there was no available test time until the next day, January 19, Brennan told Hill "that nothing was going to be accomplished that evening, and *** we were going to have to do it tomorrow; at which time [Hill] became concerned that members of the gangs or the defendant—who he was describing as the defendant would find out that he was talking to police and would anyway attempt to harm him." Boyle testified that Hill "indicated to my partner and myself that he was somewhat fearful about going back into the 14th district as far as he might become the victim of a gang retaliation."

Brennan testified that he told Hill he could stay overnight at Area Five, but must ask permission to leave the interview room so as not to disrupt ongoing investigations at the station. Brennan explained that he excluded the reason for Hill's overnight stay from his case report—a fear of retaliation—because he considered the information irrelevant to the investigation.

Brennan and Boyle testified that Hill ate sandwiches purchased at about 6 p.m. Brennan described the interview room as 12 by 10 feet with a bench, table, chairs, and a metal ring on the wall above the bench. He also testified that he told the sergeant in charge that "a witness, not an offender" planned to stay the night in one of the interview rooms.

Brennan and Boyle testified that, to the best of their knowledge, no one read *Miranda* rights, coerced Hill, or prohibited him from using a washroom or telephone. They further testified that when they left Area Five on the evening of January 18, 1990, Hill was seated in the unlocked interview room, neither handcuffed nor under arrest, and free to leave at any time.

Brennan returned to Area Five shortly after 8 a.m. on January 19, 1990, and found Hill in the interview room. He and Detective Schak testified that after conversations with Hill, the Nowak investigation focused on a man named Darryl Washington. Brennan testified that police brought Washington to the station. He also testified that only he and Detectives Boyle, Smitka, and Schak had contact with Hill and Washington, and that no one told Hill of Washington's presence or the substance of conversations with Washington.

Detective Smitka testified that he arrived at Area Five at 8 a.m. and learned that Hill spent the night at the station at his own request. Smitka testified that his work on the Nowak case involved Washington. He testified that he did not mistreat Hill, Hill did not ask to leave the station, and Hill had no marks or injury on his body.

Detective Schak testified that he saw Hill for the first time around noon on January 19, having heard from Detective Brennan that a

potential witness to a year-old homicide spent the night at the station. Brennan testified that around noon, Hill changed his story slightly. Schak testified that Brennan pointed out that some of Hill's statements were inconsistent. The inconsistent statements led the detectives to broaden the investigation to include Hill as a suspect rather than a witness, and Schak read Hill his *Miranda* rights. Schak then placed Hill under arrest. Brennan and Schak testified that Hill understood his rights and talked about the homicide until about 1:30 p.m. They then locked Hill in the interview room, still unrestrained, until the assistant State's Attorney arrived.

Assistant State's Attorney Thomas Lyons testified that he arrived at Area Five at 7 p.m. on January 19, 1990. He read the reports and introduced himself to Hill in the interview room. Lyons recalled that Hill was not handcuffed and appeared "in fine condition." He explained the nature of his job to Hill and advised him of his constitutional rights. Hill said he would waive his rights and talk about the Nowak murder. Lyons and Hill talked for about 20 minutes, beginning at 8 p.m.

Lyons testified that he then left the interview room and interviewed Washington. Lyons and Schak testified that Lyons returned to the interview room at 9 p.m. and asked Hill if he wished to have his statements reduced to writing. Lyons testified that Hill preferred a handwritten rather than a court-reported statement.

Lyons spent about 30 minutes writing Hill's statement and another 30 minutes with Hill reviewing the document line by line with him. Lyons said Hill signed the statement at 10 p.m.

Lillian Hill, Hill's sister, testified that on January 18, 1990, she was watching television in the Hill family home at 1457 North Leavitt in Chicago. Around 12:30 p.m., Hill left the house to wait for the mailman. Hill then came back in the house and got a coat and a sandwich and went back outside. Later, Lillian's sister and boyfriend knocked on the door and when they entered they informed Lillian that "the police are taking Ricky."

Lillian testified that she then went to the door and saw the police searching Darryl Washington and a man named Dwight. After searching Dwight and Darryl, the officer handcuffed Hill and put him in a car and left.

Hill testified that he was on his porch waiting for the mailman with Darryl Washington. Hill then went into the house to get a sandwich and a coat and when he returned to the porch, a detective was searching Darryl and Dwight. The detective then searched him, handcuffed him, and took him to the police station. Hill testified that the police said they had a warrant for his arrest.

Once at the police station, two detectives arrived and asked him if he knew anything about a murder to which Hill replied "No." The detectives then took him to Area Five in handcuffs and put him in an interview room. Hill said the detectives again asked him if he knew anything about a murder and also threatened him. Hill told them that he knew nothing about the murder.

Hill said he was never fed, was not allowed to contact his family, and was locked in the interview room overnight. He said no one struck or threatened him on January 18, 1990.

The next day, Hill said he was questioned again. According to Hill, another detective, who did not testify at the suppression hearing, pulled a chair from under Hill and grabbed him by the neck. He then twisted Hill's arm back and slammed him back into the chair and asked Hill if he wanted to make a statement. Hill told him he did not. The detective then slapped Hill and left.

Hill then testified that an assistant State's Attorney arrived and asked him if he wanted to make a statement. Hill declined. Hill testified that he signed the statement because the assistant State's Attorney told him it would help him. Hill claimed that the statement was covered when he signed it and that he never read the statement.

OPINION

Initially, the State contends on appeal that Hill waived the issue of an illegal arrest when he failed to file a pretrial motion to quash arrest and raised it for the first time on appeal. When a party raises a question for the first time on appeal it is generally considered waived. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

The document filed by defense counsel that triggered the hearing in this case was headed "Motion to Suppress Statements." At one point in the hearing, a question arose about the nature of the motion. It is clear that the trial court conducted a hearing on a motion to suppress. The court properly apportioned the burden of proof and properly ruled that the State had met its burden of showing that no improper inducement existed at the time the confession was made. But it is also clear that the court allowed into evidence all essential facts necessary to rule on a motion to quash Hill's arrest.

■ The waiver rule is rooted in the reluctance of reviewing courts to consider a question where no exceptions were preserved or the question was improperly presented, but waiver should not be invoked to deprive a defendant of his right to due process. (*People v. Burson* (1957), 11 Ill. 2d 360, 143 N.E.2d 239.) Here, there is no question that a due process right is implicated, nor does the record, which covers the chronology of Hill's first encounter with the police through the

time he made a statement 23 hours later, imperfectly present the issue. As the supreme court stated in *Burson*, "[waiver] is a rule of administration and not of jurisdiction or power, and it will not operate to deprive an accused of his constitutional rights of due process. The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly presented.' " (*Burson*, 11 Ill. 2d at 370-71, 143 N.E.2d at 245, quoting 3 Am. Jur. *Appeal & Error* § 248, at 33 (1936).) The record in the present case contains ample evidence for this court to address the issue of whether Hill's statements were a product of an illegal arrest, and this court will consider the issue despite the alleged waiver.

The test to determine whether a person is under arrest is whether a reasonable person in Hill's position, innocent of any crime, would believe that he was not free to leave. (*People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) If a reasonable person would so conclude, the detention is unlawful. (*People v. Hardway* (1987), 163 Ill. App. 3d 596, 516 N.E.2d 830.) Reviewing courts will not overturn a trial court's ruling on a motion to quash an arrest and suppress evidence unless that ruling is manifestly erroneous. (*People v. Winters* (1983), 97 Ill. 2d 151, 454 N.E.2d 299; *People v. Graham* (1991), 214 Ill. App. 3d 798, 573 N.E.2d 1346.) On review, we have considered only the testimony of the police officers so that we do not interfere with the trial court's judgment on issues of credibility. *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295.

Hill contends that he was under arrest from the time he was taken off the street until the time he made his statement 23 hours later. The State concedes that there was no probable cause to arrest Hill until he was read *Miranda* warnings the afternoon after he was stopped on the street, but the State argues that Hill's presence at the station was voluntary, noncustodial police contact.

Defendant argues that the facts and inferences under the broad directions of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, and with the guidance of *People v. Gordon* (1990), 198 Ill. App. 3d 791, 556 N.E.2d 573, and *People v. Young* (1990), 206 Ill. App. 3d 789, 564 N.E.2d 1254, require the reversal of the trial court's ruling. Defendant argues that the police conduct in this case reveals the " 'quality of purposefulness' " criticized in *Dunaway*, and that the circumstances echo those that led to the reversal of convictions in *Gordon* and *Young*. (*Dunaway*, 442 U.S. at 218, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259, quoting *Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262.) We disagree.

In *Gordon*, the defendant stayed overnight at the police station to insure his sobriety for a polygraph examination. The court in *Gordon* noted that the police went to defendant's house in the middle of the night to get information they already had and that neither the idea to take a polygraph examination nor the idea to sober up at the police station was defendant's idea. The court held that the police conduct in requesting defendant's presence at the police station at 12:30 a.m. to provide a better environment to question defendant and the "absurd" notion that defendant would rather sleep in the police station than at home to insure his sobriety violated the defendant's fourth amendment protections. *Gordon*, 198 Ill. App. 3d at 798, 556 N.E.2d at 577.

Here, the record shows that Hill voluntarily went to the police station during the early afternoon of January 18, 1990. At 6 p.m., Hill was asked to take a polygraph examination to verify his story. The detectives testified that Hill was free to leave, but that he asked to stay in the police station for fear of "gang retaliation." Both detectives testified that it was Hill who initially asked to stay at the station.

*Young* is also distinguishable. In *Young*, the defendant voluntarily went to the police station where he was briefly questioned and then left in an interview room for 16 hours. The State offered no reason for defendant's presence in the station. The court rejected the detective's testimony that the defendant was at the station for questioning when defendant was only questioned briefly at the commencement of his 16-hour stay. The court said "[i]f mere questioning was the goal, he would not then have been ignored and left to spend the entire night in a small, windowless room, lacking in basic facilities, with the door closed. There is no indication that defendant ever was told he was free to leave that small interview room that night." *Young* 206 Ill. App. 3d at 801, 564 N.E.2d at 1263.

The detectives in this case questioned Hill on three occasions, one lasting an hour. Meanwhile, the detectives searched for police reports on the incident Hill purportedly witnessed. At 6 p.m., the detectives asked Hill to submit to a polygraph and Hill agreed. Upon learning that no examination could be given until the following day, the detectives told Hill "that nothing was going to be accomplished that evening, and we told him we were going to have to do it tomorrow." Hill then requested to stay at the station.

The credibility of witnesses and resolution of any conflict in their testimony are the functions of the trial court. (*People v. Redd* (1990), 135 Ill. 2d 252, 553 N.E.2d 316.) A trial court's ruling will be given great deference and is not manifestly erroneous unless the error is

clearly evident, plain, and indisputable. (*People v. Murray* (1990), 137 Ill. 2d 382, 560 N.E.2d 309; *People v. Sanders* (1991), 209 Ill. App. 3d 366, 568 N.E.2d 200.) A reviewing court will give great deference to the trial court's factual findings because the court stands in the best position to weigh the credibility of all the witnesses. (*People v. Garriott* (1993), 253 Ill. App. 3d 1048, 625 N.E.2d 780.) When faced with contradictory evidence, reviewing courts will not substitute their assessment of the credibility of the witnesses for that of the trial judge. *Winters*, 97 Ill. 2d 151, 454 N.E.2d 299; see also *People v. Enis* (1994), 163 Ill. 2d 367, 645 N.E.2d 856.

■ Here, the court believed the testimony of the detectives that Hill asked to stay at the police station for his own safety. We are not prepared to find that the testimony of the six police officers and one assistant State's Attorney in this case was so patently absurd that it could not be believed. Therefore, the findings of the trial court that defendant voluntarily went to the police station and voluntarily remained there overnight are not manifestly erroneous.

Hill also argues that the court erred in denying his motion *in limine* regarding evidence of other crimes. The evidence consisted of a prior robbery which involved Hill and Darryl Washington. At trial, Anna Martinez testified that in March 1985 her purse and groceries were taken by a group of youths. Officer Xavier Castro testified that defendant confessed he acted as a lookout in that crime.

Evidence of other crimes is generally not admissible if it is relevant merely to establish the defendant's propensity to commit crime (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821); however, evidence of other crimes committed by defendant may be admitted if relevant to establish any material question other than the propensity to commit crime (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840). Other crimes which are similar to the crime charged increase the relevance of the evidence and ensure that its use is not improper. *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.

■ Here, the court allowed the State's use of other crimes evidence to establish Hill's common scheme and design. The evidence showed that Hill and Washington had assumed similar roles in a prior robbery—Washington acted as the primary robber and Hill as the lookout. The evidence was also relevant to refute defendant's statement that he "chickened out" of committing the crime and then innocently acted as a lookout. The evidence was therefore relevant for a purpose other than propensity to commit crime and was admissible. *McKibbins*, 96 Ill. 2d 176, 449 N.E.2d 821.

Hill also argues that the court abused its discretion when it sentenced him to 32 years in prison. We disagree.

The trial court's determination of the appropriate sentence in a given case is within the sound discretion of the trial judge and his decision will not be overturned absent an abuse of that discretion. (*People v. Wilson* (1991), 143 Ill. 2d 236, 572 N.E.2d 937.) The weight attributed to each factor in aggravation and mitigation in setting a sentence depends on the particular circumstances of each case. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The sentencing judge is in the best position to consider all factors relating to sentencing and is vested with wide discretion in making a reasoned judgment concerning the appropriate penalty. *People v. O'Neal* (1988), 125 Ill. 2d 291, 531 N.E.2d 366.

■ We find that the trial judge did not abuse his discretion in sentencing defendant to a term of 32 years in prison. The sentencing hearing included testimony from both the State and defense witnesses. The record reveals that factors in mitigation, which included that Hill was only 19 years old, he did not physically harm the victim, his rehabilitative potential, and his lack of a criminal record, were argued before the court and that the court considered them.

Affirmed.

S. O'BRIEN, J., concurs.

JUSTICE CAHILL, dissenting:
*Dunaway* concludes with these words: "To admit petitioner's confession in such a case would allow 'law enforcement officers to violate the Fourth Amendment with impunity, safe in the knowledge that they could wash their hands in the "procedural safeguards" of the Fifth.'" (*Dunaway*, 442 U.S. at 219, 60 L. Ed. 2d at 840, 99 S. Ct. at 2260, quoting Comment, *Criminal Procedure—Fourth Amendment Exclusionary Rule—Miranda Warnings Do Not Per Se Render Admissible A Confession Following An Arrest Which Violates Fourth Amendment Rights,* 25 Emory L.J. 227, 238 (1976).) A little later, in a concurring opinion, Justice Stevens writes: "The justification for the exclusion of evidence obtained by improper methods is to motivate the law enforcement profession as a whole—not the aberrant individual officer—to adopt and enforce regular procedures that will avoid the future invasion of the citizen's constitutional rights." *Dunaway*, 442 U.S. at 221, 60 L. Ed. 2d at 841, 99 S. Ct. at 2261 (Stevens, J., concurring).

With the majority, I defer to the credibility findings of the trial court. That disposes of the voluntary nature of Ricky Hill's confession as an issue under the fifth amendment, but it is only a threshold

issue under the fourth amendment. *Dunaway*, 442 U.S. at 217, 60 L. Ed. 2d at 839, 99 S. Ct. at 2259; *Brown v. Illinois* (1975), 422 U.S. 590, 604, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2262.

The difficulty we face in this case is created by the testimony in support of voluntary behavior dating back to the moment the police officers encountered Hill on the street. The majority accepts the elapsed time and circumstances as allowable under a fourth amendment analysis because Hill's presence was voluntary. I do not. We part company because I believe the circumstances of Hill's interrogation require us, under *Dunaway*, to examine the conduct of the police independently of Hill's cooperation. So examined, I believe the conduct of the police officers falls far short of the "regular procedures" urged by the concurrence in *Dunaway* and is a good example of the "purposefulness" of police conduct criticized in the *Dunaway* majority opinion. I reach the same conclusion here that the United States Supreme Court reached in *Brown v. Illinois*: "The detectives embarked upon this expedition for evidence in the hope that something might turn up." *Brown*, 422 U.S. at 605, 45 L. Ed. 2d at 428, 95 S. Ct. at 2262.

We do no violence to effective law enforcement, even in cities troubled by crime, nor to the right of police officers to conduct reasonable interrogations, even in murder cases, if we conclude that 23 hours in a police station and an overnight stay in a bedless interrogation room are unacceptable procedures in a democracy that honors the fourth amendment. I respectfully dissent.