THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH HANSEN, Defendant-Appellant.

First District (4th Division)   Nos. 1—95—4033, 1—98—2295 cons.

Opinion filed May 18, 2000.

HALL, J., dissenting.

Arthur J. O'Donnell and Kenneth N. Flaxman, of Chicago (Leonard C. Goodman, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HOFFMAN delivered the opinion of the court:

On October 18, 1955, the unclothed bodies of 11-year old Tony Schuessler, 13-year old John Schuessler, and 13-year old Robert Peterson were found in the Cook County forest preserve located near Lawrence Avenue and River Road. In September 1995, following a jury trial, the defendant, Kenneth Hansen, was convicted of the first degree murders of the three boys and, having elected to be sentenced under the Unified Code of Corrections of 1973 (Ill. Rev. Stat. 1973, ch. 38, par. 1001—1—1 *et seq.*), was sentenced to concurrent prison terms of not less than 200 years and not more than 300 years. In these consolidated appeals, the defendant appeals from his convictions and from the trial court's subsequent denial of his postconviction petition.

At trial, the State presented evidence establishing that the three victims left the Monte Cristo Bowling Alley around 8 p.m. on October 16, 1955, all wearing jeans and baseball jackets. Between 8:30 and 9

p.m., Ralph Helm saw a boy he later identified as Tony Schuessler standing on Milwaukee Avenue, just south of Lawrence Avenue, with his thumb extended as if he were hitchhiking. Two other boys, who were dressed in jeans and "sports jackets" and who appeared to be older than Tony Schuessler, were standing in a doorway 8 to 10 feet away. Between 9 and 10 p.m. that same night, Hettie Salerno heard two screams coming from the direction of the Idle Hours Stable, which was located near the forest preserve where the victims' bodies were discovered two days later.

Dr. Edmond Donoghue was qualified as an expert in the field of forensic pathology. Although Dr. Donoghue had not performed the autopsies on the victims, he had reviewed the crime scene photographs, the autopsy photographs, and the autopsy reports. He testified that Tony Schuessler had been manually strangled, John Schuessler had been strangled in a manner consistent with a choke hold, and Robert Peterson had been strangled with an item such as a belt or rope. On cross-examination, Dr. Donoghue testified that he found no evidence of hay, horse manure, oats, barley, or horse feed on the victims' bodies. He also acknowledged that two reports he reviewed regarding the murders stated that there was no evidence that the victims had been sexually molested. On redirect examination, Dr. Donoghue testified that, if oral sex had been performed upon a homicide victim, there would not likely be any evidence of it. The assistant State's Attorney then asked Dr. Donoghue: "Can you yourself draw any inference of sexual molestation in your opinion in this case?" Dr. Donoghue responded affirmatively and stated that, in his opinion, there was "at least evidence that's suggestive of a sexual nature of this attack because the deceased were found without any clothing." On re-cross-examination, Dr. Donoghue admitted that the fact that the victims' clothing had been removed might not have anything to do with sex.

Judith Anderson testified that she met the defendant at the Idle Hours Stable in August 1955, at which time the defendant told her that he had worked at the stable on and off for one year. Donna Ewing testified that she took a horseback riding lesson from the defendant at the Idle Hours Stable in 1955 or 1956. When Ewing met the defendant at another stable in 1971 or 1972, he did not remember her but did acknowledge that he had given riding lessons at the Idle Hours Stable.

Roger Spry testified that he began living with the defendant's family in 1960 or 1961 when he was 11 or 12 years old. Initially, he was allowed to sleep in the house with the defendant's family but, after spurning the defendant's sexual advances, he was forced to sleep in the dog kennel. One night when Spry was 11 or 12, the defendant performed oral sex on him, following which the two had a sexual rela-

tionship which lasted until Spry was 18. In total, Spry lived with the defendant on and off for 20 years. According to Spry, the defendant picked up male hitchhikers between the ages of 11 and 16 and offered them lodging at the stables in exchange for work. Spry was sometimes with the defendant when the defendant did so. On many occasions, the defendant told Spry he had sex with these boys.

Spry testified that, when he was about 15, the defendant told him that he once picked up three boys who were hitchhiking and took them to a barn. According to the defendant, he was in the barn having sex with the two younger boys when the older boy walked in on them. When one of the boys threatened to report what he had done, the defendant grabbed the boy and held him by the throat. According to the defendant, he accidentally strangled the boy and then had no choice but to kill the other two boys. After the defendant killed the boys, a friend of his arrived and helped him take the bodies to the forest preserve. According to Spry, the defendant referred to one of the boys as Peterson. Spry testified that, on another occasion, the defendant caught him pocketing money from riders at the stable and told him "you're going to end up just like that Peterson kid." Spry stated that he did not report these events to the police because he was scared, but he did later tell Colleen Quinn and William Wemette. Spry acknowledged that he first told law enforcement officials about the defendant's statements in August 1994 while facing prosecution for arson and that, in exchange for his testimony in this case, his sentence in the arson case was being reduced.

Colleen Quinn testified that, in August 1992, Spry told her that the defendant once caught him stealing money and said to him "if you ever do that again you will end up like the Peterson boy."

Herb Hollatz testified that, in 1952 or 1953, when he was 21 years old, he lived and worked at the Park Ridge Stable for two to four months, during which time he had consensual sexual relations with the defendant. The defendant went into the service in late 1953. When Hollatz next saw the defendant, in October 1955, they engaged in sexual activity. At that time, the defendant told Hollatz that he had "just killed" three boys he had picked up hitchhiking. The defendant said that someone told him to kill the boys and threatened that, if Hollatz told anyone, the defendant's brother, Curtis, "would take care of things." Hollatz took the threat to mean that Curtis would kill him. Hollatz testified that this conversation took place approximately one week after the victims' bodies were found. Nonetheless, he did not tell his father, a Chicago police officer, about the conversation because he did not want his father to know about his homosexual relationship with the defendant. Although his father died in 1980, Hollatz first told

the authorities about the incident when he was approached by an assistant State's Attorney in April 1995.

Robert Stitt testified that he began working at the High Hopes Stables, owned by the defendant, in 1963, when he was about 11 years old. When Stitt was 12 years old, the defendant made sexual advances, which Stitt rejected. When Stitt was 13 or 14 years old, he moved in with the defendant's family. He later went into the service but returned to live at the stable when he was discharged, living there until about 1979. Stitt testified that, "periodically throughout the years," he and the defendant "talked about hitchhikers, bringing them in for stable hands." On one occasion, in 1974, Stitt called the defendant from Alabama to tell the defendant that he had found two 15-year-old boys who needed jobs. The defendant told Stitt to bring the boys to the stable. Later, the defendant told Stitt to bring one of the boys to the defendant's apartment because he wanted "to do" the boy. Stitt testified that, during the years, he picked up 30 or more boys who were hitchhiking and took them to the defendant's stables "for that purpose."

Joe Plemmons testified that he met the defendant in 1970 or 1971 and subsequently began leasing part of the Sky High Stables from him. Plemmons and the defendant were driving home from a party together in May 1972 when the defendant said that his brother Curt "held those boys over his head like a club." In April 1976, the defendant commented that "it was either the boys or him" because "in 1955 to be gay was unacceptable." On another occasion, in 1988, the defendant acknowledged to Plemmons that he worried about being caught for the murders of the three boys. Plemmons admitted that he had been convicted of fraud in 1992, that he was on probation for that offense, and that he has been known by three or four aliases.

Lance Williamson testified that he met the defendant in 1974 and began working for him at the Sky High Stables. A short time later, the defendant told Williamson that he often picked up young boys hitchhiking in order to have sex with them. The defendant also told Williamson that he had worked at the Idle Hours Stable in the 1950s.

Patrick Mason testified that in 1956, when he was 11 years old, he worked at the Bro-Ken H Stables on the weekends. One day he walked into a barn and saw the defendant performing oral sex on a 15-year-old boy. The defendant later approached Mason and told him that, if he told anyone what he had seen, he would "wind up in the woods like those other boys."

William Wemette testified that he lived at the Sky High Stables off and on between the years of 1968 and 1973. Wemette drove the defendant around quite a bit because the defendant did not have a driver's

license. They often picked up male hitchhikers between the ages of 12 and 16. On one occasion in 1968, Wemette and the defendant had a conversation "about a very famous case, the Peterson boys." The defendant told Wemette he had picked up the three boys hitchhiking, taken them to the Idle Hours Stable, and strangled them. The defendant also stated that his brother Curt had injured one of the boys with a blunt instrument. During another conversation that took place several weeks later, the defendant told Wemette that he sent the older two boys out riding in the arena and took the younger boy into the barn, where he performed oral sex on the boy. When he finished, the defendant sent the younger boy out to the arena and took the middle boy into the barn. The older boy and the younger boy interrupted them and threatened to call the police or their parents. The defendant told Wemette that there was then "kind of a scramble-type situation and he asked for assistance from his brother." Wemette testified that, during another conversation, the date of which he could not recall, the defendant said that his brother had "botched the job" when he disposed of the bodies, leaving behind a piece of evidence that could connect the defendant to the murders. According to Wemette, the defendant told him that a forest preserve employee had also been involved. The defendant also told Wemette that, in order to protect himself from being caught, he had moved to the south side of Chicago and that someone had burned down the Idle Hours Stable for him. Wemette admitted that he had been a "mole" for the Federal Bureau of Investigation from 1971 through 1989.

Chicago police officer John Farrell testified that, after the defendant was arrested, he told Farrell that, from the 1950s through 1974, he picked up male hitchhikers between the ages of 12 and 22 for the purpose of having oral sex with them. The defendant denied any personal knowledge of the victims' murders. He initially denied having ever been to the Idle Hours Stable but later stated he had been there two or three times.

Assistant State's Attorney Barbara Riley testified that, when she questioned the defendant, he denied any knowledge of the victims' murders and of the Idle Hours Stable. The defendant did tell her that he often picked up "throw-a-way" boys, boys with problems, who were hitchhiking and offered them work and lodging at the stables. He described having casual sex with these boys.

The State also presented a stipulation that, if called, Park Ridge Deputy Fire Chief John Lamar would testify that the Park Ridge fire department responded to a call at the Idle Hours Stable on May 15, 1956. The State then rested.

On the defendant's behalf, Frank Jayne testified that, from 1950

to 1960, his brother Silas owned the Idle Hours Stable and that the defendant, whom Jayne met in the early 1960s, did not work there. Jayne further testified that, in 1955, the Idle Hours Stable was patrolled at night by a watchman and dogs. Barbara Beitzel Ashbough testified that she worked at the Idle Hours Stable in the summer of 1954 and began teaching there full time in 1955. She never saw the defendant, a former neighbor of hers, at the stable during the years 1954, 1955, or 1956. According to Ashbough, there was a night watchman at the stable and the gates and doors to the barns were locked at night. She testified that there was a fire in one of the barns in May 1956.

Edwin Thomas testified that he first met the defendant at the Bro-Ken H Stable in 1957 or 1958 when Thomas was about eight years old. Thomas later began doing chores around the stable in exchange for being allowed to ride the horses. Although Thomas arrived at the stable early in the morning, before school, he never saw Spry sleeping in a dog kennel. When Thomas arrived, Spry would either be outside or in the house. Thomas also testified that Spry had a poor reputation for truthfulness. The defendant's son, Mark Hansen, testified that Spry lived with his family in their house and that he never saw Spry sleep in a dog kennel.

Dan Strong testified that he served in the military with the defendant. After the defendant was discharged from the military in 1955, he and his wife visited Strong in Texas. Strong believed this was in October 1955, but he could not recall the exact dates. After Strong's testimony, the defendant rested.

The jury found the defendant guilty of the first degree murders of all three boys. After he was sentenced, the defendant filed a direct appeal (docket No. 1—95—4033) in which he argues that: (1) the search warrant issued for his home was invalid; (2) the trial court erred in denying him a continuance of the trial date; (3) the trial court improperly allowed the medical examiner to offer opinion testimony that the victims had been sexually molested; (4) the trial court improperly admitted evidence that the defendant had consensual homosexual relations with Herb Hollatz; (5) the trial court improperly admitted evidence that the defendant routinely picked up young male hitchhikers and sexually molested them; and (6) the defendant was not proved guilty beyond a reasonable doubt. While his direct appeal was pending, the defendant filed a petition for postconviction relief, seeking a new trial on the grounds that newly discovered evidence raised a reasonable doubt as to his guilt and that the State's failure to disclose certain evidence to him violated his right to due process. Following an evidentiary hearing, the trial court entered an order deny-

ing the defendant's postconviction petition. The defendant filed a timely appeal from that order (docket No. 1—98—2295). The defendant's direct appeal and his appeal from the denial of his post-conviction petition have been consolidated for purposes of review. We turn first to the issues raised in the defendant's direct appeal.

We first address the defendant's argument that the trial court erred in allowing Dr. Donoghue to testify that, in his opinion, the fact that the victims' bodies were found unclothed was "suggestive of a sexual nature of this attack." The defendant argues that, in the absence of any physical evidence of sexual molestation, such an opinion was beyond the pathologist's expertise.

■ A witness is allowed to testify as an expert on a particular subject if, due to his experience and qualifications, his knowledge of the subject is beyond that of the average citizen. *People v. Miller*, 173 Ill. 2d 167, 186, 670 N.E.2d 721 (1996). Having been qualified as an expert in the field of forensic pathology, Dr. Donoghue was qualified to offer an opinion as to whether any physical evidence discovered during an examination of the victims' bodies indicated that sexual molestation had occurred. Dr. Donoghue acknowledged that there was no physical evidence of sexual molestation. There is, in fact, no basis in the record for concluding that Dr. Donoghue's opinion that the victims were sexually molested was formulated based on his knowledge and experience as a forensic pathologist. Our supreme court, however, has noted that the fact that a murder victim is found unclothed is "consistent with a sexual assault." *People v. Bounds*, 171 Ill. 2d 1, 43, 662 N.E.2d 1168 (1995). Accordingly, we cannot say that the trial court erred in allowing his testimony. Furthermore, we note that Dr. Donoghue admitted on cross-examination that the fact that the victims' clothing had been removed might not have anything to do with sex.

We now turn to the central issue in this case, the question of whether the trial court erred in admitting evidence that, over a time period spanning 20 years, the defendant routinely picked up young male hitchhikers and sexually molested them. The trial court denied the defendant's motion *in limine* to bar this evidence and overruled numerous objections to the evidence at trial. The defendant contends that these rulings were in error.

■ Before addressing this issue, we find it necessary to draw a distinction between evidence that the defendant engaged in sexual relations with young male hitchhikers and evidence that the defendant engaged in, or attempted to engage in, sexual relations with certain trial witnesses. Roger Spry testified that, as a minor, he had a continuing sexual relationship with the defendant. The defendant does not contend that this evidence was improperly admitted, nor could he do

so successfully. The testimony regarding the defendant's sexual relationship with Spry was relevant as it established the defendant's close relationship with that witness, making it more likely that the defendant would make inculpatory statements to him. Hollatz's testimony regarding his consensual sexual relations with the defendant was relevant for the same reason, and, accordingly, we reject the defendant's contention that it was admitted in error. Finally, we address the testimony of two other witnesses. Stitt testified that, when he was 12 years old, the defendant made sexual advances toward him, which he rejected. Although this evidence seems to be of questionable relevance as Stitt did not actually engage in a sexual relationship with the defendant, the defendant has not challenged the evidence. Nor has the defendant raised any allegations of error regarding Patrick Mason's testimony that, on one occasion in 1956, he saw the defendant performing oral sex on a 15-year-old boy. This testimony was relevant as it tended to establish why the defendant later approached Mason and threatened that he would "wind up in the woods like those other boys."

Having clarified that our discussion of "other-crimes evidence" does not encompass any of the above-mentioned testimony, we will now specify what testimony is encompassed. Spry testified that, during the 20 years that he lived on and off with the defendant, the defendant picked up 11- to 16-year-old hitchhiking boys and offered them jobs at the stables, often telling Spry he had sex with these boys. Stitt testified that he and the defendant discussed bringing hitchhiking boys to the stables to work, that on one occasion the defendant instructed Stitt to bring one of these boys to his apartment because he wanted "to do" the boy, and that Stitt picked up 30 or more boys and took them to the stables "for that purpose." Williamson testified that, in 1974, the defendant told him that he often picked up young boys hitchhiking in order to have sex with them. Wemette testified that, from 1968 to 1973, the defendant frequently picked up male hitchhikers between the ages of 12 and 16. Officer Farrell testified that the defendant admitted that, from the 1950s through 1974, he picked up male hitchhikers between the ages of 12 and 22 for the purpose of having oral sex with them. Finally, Assistant State's Attorney Riley testified that the defendant told her he had casual sex with boys he had picked up hitchhiking and given work at his stables.

■ Having defined the testimony to which the defendant objects, we now turn our attention to the task of determining whether it was properly admitted. The law distrusts the inference that a defendant who has committed other crimes is more likely to have committed the crime with which he stands charged. *People v. Pitts*, 299 Ill. App. 3d

469, 474, 701 N.E.2d 198 (1998). Accordingly, evidence of other crimes or bad acts committed by a defendant is inadmissible where relevant only to establish that the defendant has a propensity to commit crimes. *People v. Banks*, 161 Ill. 2d 119, 136-37, 641 N.E.2d 331 (1994); *People v. Illgen*, 145 Ill. 2d 353, 364, 583 N.E.2d 515 (1991). Such evidence, however, may be admitted if it is relevant for any other purpose, such as to establish motive, intent, identity, absence of mistake or accident, the existence of a common plan or design, or *modus operandi*. *Banks*, 161 Ill. 2d at 137. Even where a proper purpose exists, however, other-crimes evidence may not be admitted unless the party offering it presents evidence that the other crime actually occurred and that the defendant participated in its commission. *People v. Lucas*, 151 Ill. 2d 461, 486, 603 N.E.2d 460 (1992); *People v. Thingvold*, 145 Ill. 2d 441, 455, 584 N.E.2d 89 (1991). These facts need not be established beyond a reasonable doubt but must be by more than a mere suspicion. *Thingvold*, 145 Ill. 2d at 456. Additionally, even where relevant for a proper purpose, other-crimes evidence should be excluded if the prejudicial effect of the evidence substantially outweighs its probative value. *People v. Placek*, 184 Ill. 2d 370, 385, 704 N.E.2d 393 (1998). The decision as to whether to admit other-crimes evidence lies within the trial court's sound discretion, and we will not reverse its decision absent a clear abuse of that discretion. *People v. Robinson*, 167 Ill. 2d 53, 63, 656 N.E.2d 1090 (1995).

We initially note that, although the defendant was charged only with murder, the State introduced evidence, not of other murders committed by the defendant, but of the defendant's alleged sexual assaults of other young boys. Clearly, evidence that the defendant routinely picked up young boys hitchhiking and sexually assaulted them could not be used to directly establish that the defendant killed the victims. Rather, it is apparent that the State sought to establish, through the use of this pedophilia evidence, that the defendant was the person who picked up the victims and sexually assaulted them. In doing so, the State could establish that the defendant was more likely than not also the person who killed the victims, having had both the opportunity and the motive to do so.

The defendant first argues that, because there is no physical evidence that the victims were sexually assaulted, any evidence that the defendant sexually assaulted other boys is irrelevant. The State does not dispute the fact that other-crimes evidence of pedophilia is only arguably relevant in this case if the victims were sexually assaulted. The State, however, asserts that the defendant's statements to Spry and Wemette and the fact that the victims' bodies were unclothed when found establishes that the victims were, in fact, sexu-

ally assaulted. We must determine whether this evidence alone was sufficient to establish, for our purposes, that the victims were sexually assaulted. There is evidence, independent of the defendant's own statements, that the victims in the instant case were last seen hitchhiking and that their unclothed bodies were discovered in the forest preserve three days later. We note that this evidence tends, to some degree, to suggest that a sexual offense occurred, although we recognize that other possible explanations exist. See *People v. Montes*, 192 Ill. App. 3d 874, 881, 549 N.E.2d 700 (1989). We also note that there is independent evidence corroborating certain details of the defendant's statements, in which he acknowledged committing both sexual assault and murder. The defendant stated that he picked up the boys hitchhiking, that one of the boys was named Peterson, and that he left the bodies in the forest preserve. Additionally, medical evidence that one of the boys was strangled in a manner consistent with a choke hold corroborated the defendant's statement that he accidentally strangled one of the boys while holding him by the neck. Thus, we find that the defendant's statements were corroborated to such a degree as to ensure their reliability and that the statements, when considered in conjunction with the admittedly slight independent evidence suggesting that the victims had been sexually assaulted, supports, for our purposes, the inference that the victims had been sexually assaulted. See *People v. Howard*, 147 Ill. 2d 103, 588 N.E.2d 1044 (1991); *People v. Prince*, 288 Ill. App. 3d 265, 681 N.E.2d 521 (1997); *People v. Montes*, 192 Ill. App. 3d 874, 549 N.E.2d 700 (1989); *People v. Bell*, 233 Ill. App. 3d 40, 598 N.E.2d 256 (1992). Compare *People v. Kokoraleis*, 149 Ill. App. 3d 1000, 501 N.E.2d 207 (1986); *People v. Wright*, 286 Ill. App. 3d 456, 677 N.E.2d 494 (1996).

Having concluded that the other-crimes evidence of pedophilia was not barred by an absence of evidence that the victims were sexually assaulted, we turn to the defendant's contention that the evidence was improperly admitted because it was not relevant to the issues of motive, intent, or common design, the purposes for which the trial court instructed the jury it could consider the evidence. As stated earlier, before other-crimes evidence can be admitted for even a proper purpose, there must be a showing that the other crime actually occurred and that the defendant committed it. For purposes of the following analysis, we will assume *arguendo* that there was such a showing.

The State argues that it "cannot seriously be challenged" that the pedophilia evidence is relevant to the issues of motive and intent. According to the State, the fact that the victims threatened to report the defendant to their parents or the police after he molested them

established the defendant's motive and criminal intent to kill the victims. However, to the extent that the State can be understood to argue that the pedophilia evidence is relevant because the defendant's motive in killing the victims was not only to prevent the police from discovering what he had done to them but also to prevent the discovery of numerous other acts of pedophilia that the defendant had committed, we must reject the argument. Most of the evidence in question pertains to incidents which occurred well after the victims' murders. The defendant can hardly be said to have been motivated to kill the victims in 1955 to prevent the discovery of acts of pedophilia he committed in the 1960s and 1970s. Officer Farrell did testify that the defendant admitted picking up and having sex with young male hitchhikers from the 1950s through 1974. This vague testimony, however, is insufficient to establish that the defendant's motive for killing the victims was to prevent the discovery of acts committed prior to October 1955. We conclude, therefore, that the trial court erred in allowing evidence of the other acts of pedophilia to establish the defendant's motive or criminal intent in committing the murders charged in this case.

In addition to motive and intent, the trial court also instructed the jury that it could consider the pedophilia evidence as being relevant to the defendant's design, which is also referred to as common design, common scheme, or common plan. Our supreme court has stated that " '[c]ommon design refers to a criminal scheme of which the crime charged is only a part.' " *People v. Jones*, 156 Ill. 2d 225, 239, 620 N.E.2d 325 (1993), quoting *People v. Rose*, 198 Ill. App. 3d 1, 7, 555 N.E.2d 414 (1990). The State argues that sufficient similarities exist between the sexual molestation of the victims in this case and the numerous acts of pedophilia the defendant committed over a 20-year period from which it can be inferred that all of the acts were committed as part of the defendant's "common plan to gain access to young boys for sexual purposes." In support of this contention, the State relies on *People v. Partin*, 156 Ill. App. 3d 365, 509 N.E.2d 662 (1987), and *People v. Davis*, 260 Ill. App. 3d 176, 631 N.E.2d 392 (1994).

In *Partin*, the defendant was charged with offenses relating to his sexual molestation of a teenage boy who worked for him. At trial, the State was allowed to introduce evidence that the defendant had sexually molested two other teenage boys who also worked for him. Noting similarities in the circumstances surrounding the incidents of molestation, the *Partin* court concluded that the testimony of the other two boys was properly admissible as evidence of *modus operandi* and as evidence of a common design or scheme "to hire male adolescents *** and to lure them to his room to engage in lewd acts." *Partin*, 156 Ill.

App. 3d at 371. In *Davis*, the defendant, the head pastor of a church, was on trial for offenses connected to various sexual activities in which he had engaged with two boys who were members of his church. In addition to introducing evidence regarding the defendant's sexual activities with the minor boys, the State introduced evidence that the defendant had engaged in homosexual relations with various adult church members. Noting the similarities between the defendant's sexual activities with the boys and his sexual activities with adult church members, this court concluded that the evidence of the latter was relevant to establish the defendant's common design, scheme, or plan, although it never defined the nature of that scheme. *Davis*, 260 Ill. App. 3d at 178-88, 190-91.

It appears that the courts in both *Partin* and *Davis*, as well as courts in a number of other Illinois cases, subscribe to the theory that the existence of sufficient factual similarities between crimes justifies an inference that the crimes were committed pursuant to a common design, scheme, or plan. See *People v. Soler*, 228 Ill. App. 3d 183, 592 N.E.2d 517 (1992) (common scheme to use "nicing" as a pretext to sexual abuse); *People v. Hill*, 272 Ill. App. 3d 597, 650 N.E.2d 558 (1995) (evidence that defendant and accomplice assumed similar roles in a prior robbery established common scheme). In *People v. Brown*, 26 Ill. 2d 308, 316, 186 N.E.2d 321 (1962), our supreme court explained the rationale involved in such cases as follows:

> "When a defendant's conduct in connection with a previous crime, particularly where the previous crime is recent and near in time, bears some similarity in significant respects to defendant's conduct in connection with the crime charged so as naturally to be caused by a general plan, the similarity indicates that the conduct was directed by design, and evidence of conduct in connection with proof of a prior offense is admissible."

Courts in a number of other jurisdictions have also adopted this line of reasoning. See *United States v. Huff*, 959 F.2d 731, 736-37 (8th Cir. 1992); *United States v. Temple*, 862 F.2d 821, 823 (10th Cir. 1988) (common design where illegal aliens were transported by same route); *State v. Lough*, 125 Wash. 2d 847, 889 P.2d 487 (1995); *People v. Ewoldt*, 7 Cal. 4th 380, 399, 867 P.2d 757, 766 (1994) (common design established by evidence defendant committed "markedly similar acts of misconduct against similar victims under similar circumstances").

A competing line of cases both in Illinois and in other jurisdictions, however, supports the conclusion that the existence of factual similarities between multiple crimes does not, in itself, establish that the crimes were committed as part of a common design, scheme, or plan. In *People v. Jones*, 156 Ill. 2d 225, 620 N.E.2d 325 (1993), at the

defendant's trial for aggravated criminal sexual assault, the State was allowed to introduce evidence that, a few months after the charged crime, the defendant had raped another woman. Our supreme court found that the evidence of the second rape did not establish the existence of a common plan because "the two rapes were not portions of one larger crime, but rather two separate and independent crimes". *Jones*, 156 Ill. 2d at 239. This was so despite the fact that the court found sufficient similarities between the charged crime and the second rape to render the evidence admissible to establish *modus operandi*. *Jones*, 156 Ill. 2d at 240. Similarly in *People v. Tipton*, 207 Ill. App. 3d 688, 696, 566 N.E.2d 352 (1990), the court found that evidence regarding an uncharged armed robbery committed by the defendant bore sufficient similarities to the charged crime to establish *modus operandi* but did not establish a common design, scheme, or plan because there was "no evidence to suggest that either offense was part of a larger criminal scheme." See also *People v. Bayer*, 160 Ill. App. 3d 218, 221, 513 N.E.2d 457 (1987); *People v. Murdock*, 259 Ill. App. 3d 1014, 1020, 632 N.E.2d 313 (1994) ("there is nothing to suggest that the three separate purse snatchings were the component parts of one larger criminal enterprise"); *People v. Kimbrough*, 138 Ill. App. 3d 481, 485 N.E.2d 1292 (1985); *State v. Moeller*, 1996 S.D. 60, 548 N.W.2d 465 (1996); *State v. Oliver*, 133 N.J. 141, 627 A.2d 144 (1993); *People v. Engelman*, 434 Mich. 204, 453 N.W.2d 656 (1990).

We believe that the line of cases referenced in the immediately preceding paragraph represents the better reasoned view. As one court noted, in order to establish the existence of a common design, scheme, or plan, there must be a showing of:

> "[a]n antecedent mental condition which evidentially points to the doing of the act planned. Something more than the doing of similar acts is required in evidencing design, as the object is not merely to negative an innocent intent, but to prove the existence [*sic*] of a *definite project* directed toward the completion of the crime in question." (Emphasis in original.) *State v. Harris*, 677 P.2d 202, 205, 36 Wash. App. 746, 751 (1984), citing M. Slough & J. Knightly, *Other Vices, Other Crimes*, 41 Iowa L. Rev. 325, 329-30 (1956).

In *State v. Oliver*, 133 N.J. 141, 627 A.2d 144 (1993), the New Jersey Supreme Court discussed the distinction between "discrete, albeit similar, acts" and acts which are part of a common plan. In that case, the prosecution argued that the sexual assaults with which the defendant was charged and the other sexual assaults of which it presented evidence were part of a common plan because the defendant had a single purpose in committing the assaults, namely to have sexual intercourse with the victims whether or not they consented. The court stated as follows:

"The State's argument confuses having a 'single purpose' binding together several crimes with having the same purpose several times. The problem is rooted in the ambiguity in the word 'purpose': it can mean a 'goal' or an 'end,' and it can also mean 'intent.' Defendant might well have had the same purpose, meaning 'intent,' each time he committed sexual assault; but he did not commit each sexual assault to further some overall purpose in the sense of pursuing a single 'goal.' " *Oliver*, 133 N.J. at 152-53, 627 A.2d at 150.

In determining whether multiple crimes have been committed as part of a common design, scheme, or plan, we find it far more sensible to focus on the defendant's state of mind or purpose in committing the offenses than on the factual similarities of the offenses. Our conclusion in this regard is supported by the fact that similarities between crimes is the focus for determining the admissibility of other-crimes evidence to establish the existence of *modus operandi*. In fact, we suspect that confusion between the concepts of common design, scheme, or plan, and *modus operandi*, a confusion which has been recognized by Illinois courts (see *People v. Rose*, 198 Ill. App. 3d 1, 6-7, 555 N.E.2d 414 (1990)), has led to the line of cases on which the State relies.

In this case, we do not believe that the evidence of the sexual assault of the victims and evidence of the defendant's sexual assault of numerous other boys over a 20-year period justifies an inference that the defendant had a consciously developed common design, scheme, or plan which included sexually assaulting the victims. Rather, we find it far more probable that each incident of sexual assault was a "discrete, albeit similar" act. To construe the term common design, scheme, or plan in such a manner as to allow the State to offer evidence of numerous acts of pedophilia under the guise of a common design, scheme, or plan "to gain access to young boys for sexual assaults" would be, in our opinion, to render the rule against propensity evidence meaningless. As one court stated, other-crimes evidence is proper "to show a design or scheme on the part of the accused to commit *the specific crime* with which he is charged, but never to show a design or scheme to commit '*crimes of the sort with which he is charged.*' " (Emphasis in original.) *United States v. Goodwin*, 492 F.2d 1141, 1152-53 (5th Cir. 1974), quoting 2 J. Wigmore, Evidence § 304, at 202-03 (3d ed. 1940). Accordingly, we conclude that the trial court erred in admitting evidence that the defendant committed other acts of pedophilia to establish the existence of a common design, scheme, or plan.

In addition to these uses, the State argued below that the pedophilia evidence was also relevant to establish that the defendant

had a particular *modus operandi*, or method of working. Although the trial court ultimately rejected that argument and declined to instruct the jury to consider the evidence for the purpose of determining whether a *modus operandi* existed, we will now consider whether the evidence could have been properly admitted for that purpose.

The term *modus operandi* refers to a pattern of criminal behavior so distinctive that separate crimes committed in that pattern are recognizable as having been committed by the same person. *People v. Berry*, 244 Ill. App. 3d 14, 21, 613 N.E.2d 1126 (1991). Accordingly, evidence of *modus operandi* is most frequently used to establish the defendant's identity as the perpetrator of the charged crime by demonstrating that the defendant has committed other crimes that were committed in the same manner as the charged crime. *People v. Barbour*, 106 Ill. App. 3d 993, 1000, 436 N.E.2d 667 (1982); *People v. Denny*, 241 Ill. App. 3d 345, 358, 608 N.E.2d 1313 (1993). "Although the similarities" between the offenses "need not be unique only to the two offenses being compared, there must be present some distinctive features that are not common to most offenses of that type in order to demonstrate *modus operandi*." *People v. Tate*, 87 Ill. 2d 134, 142-43, 429 N.E.2d 470 (1981). In the absence of any one particular distinctive feature, however, Illinois courts have found that a sufficient number of common features can form a distinctive combination sufficient to establish the existence of a *modus operandi*. *People v. Biggers*, 273 Ill. App. 3d 116, 123, 652 N.E.2d 474 (1995); *People v. Bullock*, 154 Ill. App. 3d 266, 270, 507 N.E.2d 44 (1987).

With the exception of one portion of Stitt's testimony which will be discussed below, the pertinent testimony of Spry, Stitt, Wemette, Williamson, Officer Farrell, and Assistant State's Attorney Riley established nothing more than that, during an approximately 20-year time span, the defendant picked up, or directed others to pick up, numerous young male hitchhikers, that he offered many of them work and lodging at his stables, and that he engaged in sexual activity with many of them. We cannot say that this evidence established that the defendant committed any one particular, identifiable act of sexual assault. From this evidence we cannot determine the identity of any particular victim, the location where any specific sexual assault took place, or the general time frame during which any specific assault took place. Furthermore, with the exception of Officer Farrell's testimony that the defendant stated he picked up boys for the purpose of having oral sex, we are unable to determine the nature of the sexual activity involved. This was not evidence that the defendant committed certain specified crimes but, rather, evidence that, during the 1950s, 1960s, and 1970s, he picked up an unidentified number of 11- to 22-year-old

male hitchhikers and had sex with some of them. Due to the complete lack of detail regarding the defendant's activities, we find that the evidence is more in the nature of character evidence intended to demonstrate that the defendant has a propensity to commit bad acts, specifically a propensity to pick up young male hitchhikers for the purpose of engaging in sexual activity. As stated above, evidence of other bad acts may not be admitted to show the defendant's character or propensity to commit crimes. *Illgen*, 145 Ill. 2d at 364; *People v. Knight*, 309 Ill. App. 3d 224, 227, 722 N.E.2d 331 (1999). Even if we were to say that the evidence did establish the defendant's commission of other crimes, the evidence is certainly not sufficiently specific to allow us to determine whether those crimes shared, either with each other or with the sexual assault of the victims in the instant case, the distinctive features or distinctive combination of common features necessary to establish the existence of a *modus operandi*. See *People v. Velasco*, 216 Ill. App. 3d 578, 590-91, 575 N.E.2d 954 (1991).

We note that Stitt did testify with some degree of detail regarding one particular incident which occurred in 1974. According to Stitt, he called the defendant from Alabama, and the defendant told him to bring two 15-year-old boys who needed jobs to the stable. Later, the defendant instructed Stitt to bring one of the boys to his apartment because he wanted "to do" the boy. Although this evidence does arguably identify a specific crime, we cannot say that this evidence could have properly been admitted for the purpose of establishing that the defendant had a particular *modus operandi*. The 15-year-old boy to whom Stitt referred was picked up in Alabama and brought to the defendant's stable to work. Sometime after he arrived, he was taken to the defendant's apartment where, the defendant told Stitt, he engaged in sexual activity with the boy. The defendant's statements to Spry and Wemette establish that he picked up the victims in the instant case on a street corner in Chicago, took them to a stable where he worked, allowed them to ride the horses, and sexually assaulted one or two of the boys. We recognize that all crimes will have some dissimilarities and that the charged crime and the other crimes need not be identical in order to establish *modus operandi*. *People v. Taylor*, 101 Ill. 2d 508, 521, 463 N.E.2d 705 (1984). Nonetheless, we cannot conclude that the sexual assault of the 15-year-old boy shared sufficient similarities with the sexual assault of the victims here to justify a conclusion that both were committed by the same person.

■ For the foregoing reasons, we conclude that the trial court erred in admitting the above-specified testimony of Spry, Stitt, Wemette, Williamson, Officer Farrell, and Assistant State's Attorney Riley regarding the defendant's practice of picking up young male

hitchhikers and sexually assaulting them. We cannot say that the error was harmless. Improper admission of evidence of a defendant's sexual conduct with children is so prejudicial as to normally require reversal. *People v. Bobo*, 278 Ill. App. 3d 130, 133, 662 N.E.2d 623 (1996); *People v. Novak*, 242 Ill. App. 3d 836, 858, 611 N.E.2d 1203 (1993). In addition, the only evidence linking the defendant directly to the victims' murders was the testimony of Spry, Wemette, Plemmons, and Hollatz. The credibility of most of these witnesses had been significantly impeached. Therefore, we cannot say that the evidence that the defendant sexually assaulted innumerable young boys over a period of 20 years did not influence the outcome of his trial. Accordingly, we reverse the defendant's conviction.

In deciding whether it is proper to remand for a new trial, we must address the defendant's claim that his guilt was not established beyond a reasonable doubt. Despite the fact that the credibility of Spry, Wemette, Plemmons, and Hollatz had been called into question, their testimony, if believed by the jury, was certainly sufficient to support the defendant's convictions. Accordingly, we reject the defendant's claim regarding the sufficiency of the evidence. Therefore, as there is no danger of subjecting the defendant to double jeopardy, we remand this case for a new trial. See *People v. Howard*, 303 Ill. App. 3d 726, 732, 708 N.E.2d 1212 (1999).

Our resolution of this issue renders it unnecessary to address the defendant's remaining contentions on direct appeal. It also renders moot the defendant's appeal from the denial of his postconviction petition.

For the foregoing reasons, we reverse the defendant's conviction and remand for a new trial and dismiss appeal number 1—98—2295 as moot.

No. 1—95—4033, Reversed and remanded.
No. 1—98—2295, Appeal dismissed.

SOUTH, J., concurs.

JUSTICE HALL, dissenting:
I believe that the "other-crimes" evidence in this case was admissible as evidence of defendant's *modus operandi*. Moreover, the strong evidence in this case including defendant's admissions to four witnesses that he killed the boys renders harmless any error that may have occurred in admitting this other-crimes evidence. Therefore, I dissent.

*Modus operandi* refers to a pattern of criminal behavior so distinct that separate crimes or wrongful conduct are recognized as the work of the same person. *People v. Bullock*, 154 Ill. App. 3d 266, 507 N.E.2d 44 (1987). Evidence of other offenses is relevant and admissible as proof of *modus operandi* only upon a strong and persuasive showing of similarity of the crime charged and the other offenses. *People v. Partin*, 156 Ill. App. 3d 365, 509 N.E.2d 662 (1987). The crimes must share peculiar and distinctive common features so as to earmark both crimes as the handiwork of the defendant. *Bullock*, 154 Ill. App. 3d at 269.

The majority finds that we lack the amount of detail of the other crimes necessary to establish the existence of a *modus operandi*. However, the evidence establishes that in each instance the victims were young boys ages 11 to 16. The victims were all picked up while they were hitchhiking by either defendant or someone working with defendant. The victims were all brought to horse stables where defendant worked. Defendant would then engage in sexual activities with these boys. In the instant case the Peterson/Schuessler boys, ages 11 to 13, were picked up while hitchhiking, were taken to the Idle Hours stables, and were sexually assaulted. I believe that the sexual assaults committed against the Peterson/Schuessler boys in this case and the sexual assaults against other boys share peculiar and distinctive features so as to earmark the crimes as the handiwork of one man. Any possible error in the admission of the "other-crimes" evidence is harmless in light of the evidence submitted in this case. See *People v. McCarthy*, 132 Ill. 2d 331 (1989); *People v. Mikolajewski*, 272 Ill. App. 3d 311 (1995). Four witnesses testified that defendant admitted to them that he killed the Peterson/Schuessler boys. Spry testified that defendant told him that he (defendant) picked up three boys who were hitchhiking and took them back to the barn. Defendant admitted that he accidently strangled one of the boys while holding him by the neck and then had no choice but to kill the other two. Defendant admitted dumping the bodies in the forest preserve. Defendant told Spry that one of the boys was named Peterson. Hollatz testified that about one week after the bodies were found, defendant admitted that he had picked up the three boys who were hitchhiking and had killed them. Wemette testified that defendant twice admitted strangling the boys after picking them up hitchhiking and taking them back to the barn at the Idle Hours stables. Defendant also told Wemette that his (defendant's) brother was there and hit one of the boys with a blunt object. Plemmons testified that defendant told him that it was either the boys or him because in 1955 it was unacceptable to be gay. When Plemmons asked defendant if he had killed the three boys, defendant responded affirmatively.

Moreover, the independent evidence corroborated defendant's oral admissions. Defendant's admissions that he picked the boys up hitchhiking were corroborated by the testimony that the boys were last seen hitchhiking on the corner of Milwaukee and Lawrence. His admission that he took the boys to the Idle Hours Stable was corroborated by Salerno's testimony that she heard two screams coming from the direction of the stables on the night the boys disappeared. Defendant's admission that he accidently strangled one of the boys while holding him by the neck and that his brother hit one of the boys with a blunt object was corroborated by the medical testimony that John Schuessler was strangled to death in a manner consistent with being placed in a choke hold while simultaneously being struck in the head. His admissions that he strangled the boys were corroborated by Dr. Donoghue's testimony that the cause of death for each boy was strangulation. Finally, defendant's admissions that the older boy was named Peterson and that he dumped the bodies in the forest preserve were corroborated by the independent evidence regarding where the bodies were found and the identification of the bodies.

For the foregoing reasons, I respectfully dissent.