2020 IL App (2d) 170849-U
No. 2-17-0849
Order filed April 13, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-951 |
| ANDREA VAZQUEZ-HERNANDEZ, | ) ) ) | Honorable Brian F. Telander, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE BIRKETT delivered the judgment of the court.
Justices Hudson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The State proved defendant guilty beyond a reasonable doubt of attempted aggravated battery of a child, specifically that she intended to cause great bodily harm by pouring nail polish remover into the cup used by her boyfriend's 17-month-old daughter.

¶ 2    After a bench trial, defendant, Andrea Vazquez-Hernandez, was convicted of attempted aggravated battery of a child (720 ILCS 5/8-4(a), 12-3.05(b)(1) (West 2016)) and sentenced to nine years' imprisonment. The conviction was based on evidence that defendant poured nail polish remover into the sippy cup containing milk belonging to her boyfriend's 17-month-old daughter.

On appeal, she contends that the State did not prove beyond a reasonable doubt that she intended to cause great bodily harm (see *id.*). We affirm.

¶ 3                                I. BACKGROUND

¶ 4     The charge pertinent here alleged that, on or about May 29, 2016, defendant took a substantial step toward committing aggravated battery of a child by pouring nail polish remover into a baby's sippy cup, knowing that the contents would be delivered to A.F., who was a year and five months old. We summarize the trial evidence.

¶ 5     Robert Clark testified on direct examination as follows. On May 29, 2016, he resided with defendant in Carol Stream. They started their relationship in 2005. In 2009, when defendant was pregnant, they moved to Glendale Heights, where their son, C.C., was born in January 2010. In 2013, Clark and defendant broke up and he began a relationship with Cassandra Fletcher. Defendant moved out of their apartment and, in 2014, Fletcher moved in. She became pregnant. In October 2014, defendant and Fletcher broke up and she moved out. In December 2014, Fletcher gave birth to A.F. Clark and defendant reunited, and, in January 2015, they moved into the Carol Stream apartment. In April 2015, they married. Clark then had custody of A.F. from Thursday night through Monday morning each week. Defendant would help care for the baby.

¶ 6     Clark testified that, in October 2015, he attended a friend's wedding. He and defendant planned to meet at a hotel, but she never arrived. The next day, she accused him of cheating on her, which he had. Their relationship worsened. Defendant refused to watch A.F. on weekends if Clark had to work. He made other arrangements.

¶ 7     Clark testified that, shortly after the cheating incident, his car's battery died while he was at the grocery store. Defendant, C.C., and A.F. were at home. Clark called defendant and asked her to drive out and jump-start his car. She told him to walk home. He did so, then drove her car

to the store to jump-start his car. Defendant called Clark and asked where her car was; he told her. The conversation ended. He drove home and found A.F. sitting on the living room floor. Nobody else was home and the lights were off.

¶ 8    Clark testified that, in March 2016, the family took a vacation to Florida. The relationship began to improve. However, at some point, defendant started checking Clark's phone messages and found texts from Fletcher. She became jealous.

¶ 9    Clark testified that, in the month or so before May 29, 2016, A.F.'s behavior started to change. When defendant arrived home from work, A.F. would move to Clark's side. Sometimes she stared at defendant. When defendant entered the children's bedroom while they were playing, A.F. would leave the room.

¶ 10    Clark testified that, in mid-May 2016, he and defendant had a fight. Defendant and Fletcher had been communicating on Facebook, and defendant had told Fletcher not to talk to Clark. Defendant had asked him to tell Fletcher to stop communicating with him, but he told defendant that he had not done so. She said that she would take C.C. and leave Clark. He responded, " '[T]hat's fine, go ahead.' " She became furious, threw a pair of shoes at him, and clawed his face. As she let go and walked away, she told him, " 'One day I'm gonna to fucking kill you.' "

¶ 11    Clark testified that, on May 29, 2016, while defendant and the children ate dinner, he prepared a sippy cup of milk for A.F. She drank some and seemed fine. Clark and the children left to get ice cream. When they returned, defendant was in her bedroom. At some point, A.F. grabbed her cup, took a sip, spat out the milk immediately, and threw the cup onto the floor. This was not unusual and did not alarm Clark. About 15 minutes later, she signaled for more milk, so Clark handed her the cup. Once again, she took a sip, spat it out, and threw the cup onto the floor.

¶ 12    Clark testified that he then opened the cup. As soon as he removed the lid, he smelled nail polish remover. The smell was so strong that he almost gagged. Clark entered the adults' bedroom and asked defendant whether she had put anything into A.F.'s milk. She asked why he was asking. He told her that A.F.'s milk smelled like nail polish remover, and he asked what she had put into it. She replied, " 'I didn't do anything. But if that's what you think, I don't care.' " She suggested that the milk might be bad. Clark went to the kitchen and opened the container of milk in the refrigerator; it smelled and looked fine. He took the container into the bedroom, told defendant that it did not smell like nail polish remover, and again asked what she had done to A.F.'s milk. She said she had done nothing. Defendant never asked Clark whether A.F. was okay or whether she had drunk any of the milk.

¶ 13    Clark testified that he then drove A.F. to the hospital, taking the sippy cup. In the emergency room, several people opened the cup and smelled the contents. Fletcher arrived, and Clark gave her the cup to smell; the lid was loose, so some milk spilled out. Clark took the cup, closed it, and put it back. Before the spill, it had been almost full.

¶ 14    Clark testified on cross-examination as follows. Before May 29, 2016, defendant had routinely cared for A.F., and Clark had never seen signs of abuse. He had not seen any information in the apartment about the effects of nail polish remover or antidotes for poisons. The apartment contained cleaning supplies, including some containing ammonia and other toxic substances. After the fight in mid-May 2016, he and the children continued to reside with defendant.

¶ 15    Philip Heck, a Carol Stream police officer, testified as follows. On the evening of May 29, 2016, he went to the hospital and received the sippy cup. He opened it and smelled an "overwhelming" odor of nail polish remover. The cup contained milk with pink flakes floating in it. Heck took the cup into evidence. He asked officers to report to Clark's apartment.

¶ 16    Heck testified that later that evening, he went to the apartment.  Three other officers were at the door speaking with defendant.  She let them in, went to her bedroom, and returned with a bottle of nail polish remover, which they took into evidence.  Heck conversed with defendant, asking her whether anything other than milk might have been in A.F.'s cup.  At first, defendant said no, but then she said that Clark might have put something there.  Heck asked why the milk in the cup would smell of nail polish remover; defendant said that she did not know.  Throughout the conversation, defendant showed no emotion and did not seem concerned that police officers were in her home.  During his time there, Heck did not see any pamphlets or other literature relating to poisons.

¶ 17    Carol Stream police officer Thomas Andrejevic testified that, just before 11 p.m. on May 29, 2016, he joined the other officer at the apartment.  In the hallway, defendant told the officers that she did not know A.F.'s whereabouts.  Andrejevic asked her whether "her daughter" might be sick; she said that A.F. was Clark's daughter but not hers.  Throughout the 45-minute conversation, defendant spoke English, appeared to understand everything that the officers said, and remained calm.  She never asked about A.F.'s well-being.

¶ 18    Fletcher testified that she met Clark while he was still living with defendant in Glendale Heights.  Defendant moved out and Fletcher moved in.  In October 2014, she and Clark broke up and she moved out.  In December 2014, A.F. was born.  Fletcher and Clark worked out a custody arrangement.  Defendant did not participate in custody exchanges and had few contacts with Fletcher.

¶ 19    Fletcher testified that, on May 19, 2016, defendant sent her a message on Facebook to " 'stop texting [Clark] every fucking day.' "  Fletcher responded that defendant had her " 'wires crossed' " and that she texted Clark only when there was " 'a question or an issue.' "  Fletcher and

defendant exchanged insults. On May 22, 2016, defendant resumed the exchange, which ended with Fletcher telling her that if not for A.F., she would not " 'give a flying fuck' " about defendant or what she was doing with her life. Copies of the messages were admitted into evidence. On the evening of May 29, 2016, Fletcher met Clark at the hospital. When he handed her the sippy cup, she smelled "a very strong scent" that she recognized as nail polish remover.

¶ 20    The parties stipulated that Alfred Lucas was a forensic scientist at the Du Page County Crime Laboratory. Some time between May 29, 2016, and July 27, 2016, he analyzed the sippy cup and a bottle of Up & Up nail polish remover. Both contained ethyl acetate and ethyl alcohol.

¶ 21    The parties stipulated to a partial transcript and videotape of defendant's interview with Frank Jones, a Carol Stream police detective, on May 30, 2016. In the interview, defendant initially denied tampering with A.F.'s milk. Eventually, she admitted it. She said that she did it to "punish" Clark. Asked what she thought would happen, she said she "wasn't thinking in that moment." She did not want to kill A.F., but she "didn't know what was going to happen."

¶ 22    Tanya Ylaya testified that she was a nurse on duty in the emergency room when Clark and A.F. arrived. Clark showed Ylaya the sippy cup. Before he could finish removing the cap, Ylaya could "smell [the cup] from across the room." Clark took off the lid and handed the cup to Ylaya. It contained milk with "little pink flakes" in it as well. Ylaya called poison control.

¶ 23    Dr. Timothy Meehan, an expert on medical toxicology, testified that ethyl acetate, an industrial chemical, is not intended for human consumption. Once ingested, it rapidly converts to ethyl alcohol, the active ingredient in alcoholic beverages. Almost any amount of ethyl alcohol can cause gastritis. Once absorbed, ethyl alcohol enters the brain. In small children, it can cause hypoglycemia, resulting in seizures.

¶ 24    Dr. Meehan testified that, based on the label, the nail polish remover in the sippy cup was equivalent to 20% to 100% ethyl acetate. If a child of A.F.'s weight ingested one ounce, her blood alcohol content (BAC) would be between 0.07% and 0.35%; at the higher end of that range, she could go into a coma. At a BAC of 0.21%, she could be very critically ill. Also, gastric irritation could cause vomiting and, if vomit entered the lungs, severe brain damage could result.

¶ 25    The trial court admitted several photographs of the bottle of Up & Up nail polish remover that the police obtained from defendant. The label stated in part, "Harmful if ingested. In case of accidental ingestion, give fluids liberally and consult with local Poison Control Center. *** Keep out of reach of children." The first three ingredients listed were ethyl acetate, alcohol, and water.

¶ 26    The State rested. Through a translator, defendant testified on direct examination that, in May 2016, she believed that Clark was cheating on her with Fletcher. She put nail polish remover into A.F.'s milk because she was "very angry" at Clark and Fletcher and could not control her impulse. Asked, "[W]hat was your goal in doing it?," she testified, "I was thinking that the baby would get diarrhea or a stomachache." Asked why she believed that, she testified, "I didn't exactly think of the consequences." She wanted to hurt A.F. to hurt Clark and Fletcher. She chose nail polish remover because "that was what was there in front of [her]." The smell was very strong. She did not want A.F. to die or to suffer any harm worse than diarrhea or a stomachache. She admitted, however, that she did not know that A.F. would not die.

¶ 27    Defendant testified that she added the nail polish remover without researching the effects of swallowing it. She never read the warning label on the bottle. She did not consider using anything else in the apartment, such as drain cleaner. She did not put nail polish remover in Clark's coffee, because it never came to mind. She did not see A.F. drink from the sippy cup and did not notice that Clark had gone to the hospital. Before May 29, 2016, she had never harmed A.F.

¶ 28    Defendant testified on cross-examination that the cheating incident in October 2015 made her suspicious of Clark.  In the grocery store incident, she left A.F. alone in the apartment, but only for a couple of minutes as Clark approached.  During the fight in mid-May 2016, she told Clark that she would kill him one day; she was angry because she believed that he was cheating on her.  By May 29, 2016, they were barely speaking.  When she poured the nail polish remover into the sippy cup, she could not smell it.  Asked whether she anticipated that A.F. would drink the milk, she testified, "I thought that [Clark] would see it first" and "maybe he could smell it."  She lied to Clark and the police but eventually admitted her act.  She had used nail polish for more than 10 years and was aware that it is not for human consumption, especially by small children.  Although she wanted to give A.F. diarrhea or a stomachache, she did not use a laxative.  After defendant learned that A.F. was in the hospital, she never asked how the child was doing.

¶ 29    Defendant rested.  The State put on no rebuttal.

¶ 30    Defendant argued in part that the State had not proved that, when defendant poured the nail polish remover into A.F.'s milk, she intended to cause her great bodily harm.  The trial court found defendant guilty of attempted aggravated battery of a child.  Discussing intent, the court explained that defendant had been extremely angry at Clark and Fletcher and that it made no sense to get back at them merely by giving A.F. diarrhea.  Moreover, nail polish remover "takes paint off fingernails."  The court stated, "It is a caustic substance with a strong odor and it is common knowledge that that type of a substance certainly is something not to be ingested."  The court continued, "Do I believe it was the defendant's intent to cause the child diarrhea?  Absolutely not."  The court also noted the numerous inconsistencies in defendant's testimony, such as her claim that she intended only to give A.F. diarrhea and her admission that she did not know whether A.F. would die.

¶ 31    After the trial court sentenced defendant to nine years in prison.  This timely appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33    A person who is at least 18 year of age commits aggravated battery of a child when, in committing a battery, he or she knowingly and without legal justification by any means causes great bodily harm, permanent disability, or disfigurement to any child under the age of 13.  720 ILCS 5/12-3.05(b)(1) (West 2016)). On appeal, defendant contends that the State failed to prove her guilty beyond a reasonable doubt of the charge, because the evidence did not establish that she had intended to cause A.F "great bodily harm."  *Id.*  Defendant argues that the evidence left a reasonable doubt whether she intended to subject A.F. to more than diarrhea or a stomachache. For the following reasons, we hold that the State proved the required intent.

¶ 34    When considering a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the State, any rational fact finder could have found the elements of the offense proved beyond a reasonable doubt.  *People v. Ward*, 154 Ill. 2d 272, 326 (1992).  The fact finder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence.  *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995).  It is not our function to retry the defendant.  *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 35    "Great bodily harm" cannot be defined precisely but requires a greater and more serious injury than does an ordinary battery.  *People v. Figures*, 216 IL App. 3d 398, 401 (1991).  Whether a victim's injuries rise to this level is ordinarily the prerogative of the fact finder.  *Id.*

¶ 36    Depending on the circumstances, diarrhea or a stomachache would probably fall short of great bodily harm, but the trial court reasonably found that defendant intended to inflict far more

serious harm when she poured nail polish remover into A.F.'s milk. The court reasoned that defendant was motivated by long-standing rage at the parents of the victim, making it unlikely that she would seek to get even merely by causing their baby digestive distress. Moreover, the court reasoned, defendant's admitted use of nail polish remover was manifestly disproportionate to the achievement of that goal. Defendant chose a caustic substance that was plainly not intended for human consumption, and as the court noted, its purpose is to "take[] paint off fingernails." The court's inference that defendant intended great bodily harm, exceeding what would result from an ordinary battery, was well within it prerogative.

¶ 37    In arguing otherwise, defendant essentially cites five alleged infirmities in the evidence. We may swiftly dispose of three of them. First, defendant cites her own testimony that her goal in tainting A.F.'s milk was to cause only diarrhea or a stomachache and that she acted impulsively without considering the consequences. The court did not have to accept either of these contradictory explanations, in view of the contrary evidence. Second, defendant cites her posttrial psychological evaluation to suggest that she had difficulty understanding some of the questions at trial. But the evaluation was not in evidence at trial. Third, defendant contends that Dr. Meehan's testimony was both inconclusive and irrelevant to her subjective intent. However, the court's finding did not rely on Dr. Meehan's testimony at all.

¶ 38    We turn to the two remaining challenges to the evidence. Defendant notes that the State did not prove how much nail polish remover she poured into the milk. She posits that pouring only a small amount would tend to disprove the intent to cause great bodily harm. However, several witnesses testified that the odor of nail polish remover was extremely strong: for example, Ylaya could "smell [it] from across the room, even before Clark took off the cap." Most important, the victim was an infant, who was especially vulnerable. Given that great bodily harm is a question

of fact, the court could reasonably infer the requisite intent from the evidence that defendant poured enough of a caustic substance into the cup that it could be smelled from a distance.

¶ 39    Finally, defendant cites her testimony that she did not read the label on the bottle and was unaware of its contents.  The trial court did not need to credit this remarkable testimony; the court determined that defendant was not an inherently credible witness to begin with.  Her assertion was further undermined by her admission that she had used nail polish remover for years.  Also, the bottle was clearly labeled.  In any event, even had she not been familiar with the bottle's specific contents, the court could and did reasonably infer that she knew that the ingredients were unfit for human consumption and designed for a purpose that implied great danger, especially to a 17-month-old child.

¶ 40    In sum, we hold that defendant was proved guilty beyond a reasonable doubt of attempted aggravated battery to a child.

¶ 41                                III. CONCLUSION

¶ 42    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 43    Affirmed.