2021 IL App (2d) 190644-U
No. 2-19-0644
Order filed June 28, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2329 |
| KELVIN D. HALL, | ) ) | Honorable T. Clint Hull, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Jorgensen and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:   There was sufficient evidence to convict defendant of aggravated domestic battery based on strangulation. Contrary to defendant's argument, the victim's account of the attack and her conduct afterward was not inherently implausible.

¶ 2    After a jury trial, defendant, Kelvin D. Hall, was convicted of one count each of aggravated domestic battery based on strangulation (720 ILCS 5/12-3.3(a-5) (West 2018)), domestic battery (*id.* § 12-3.2(a)(1)), interfering with the reporting of domestic violence (*id.* § 12-3.5), and criminal damage to property (*id.* § 21-1(a)(1)). He was sentenced to prison terms of six years for aggravated domestic battery and four years for domestic battery and one-year jail terms on the remaining

offenses, all sentences to run concurrently.  On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt of aggravated domestic battery.  We affirm.

¶ 3                                              I. BACKGROUND

¶ 4      The charge of aggravated domestic battery alleged that, in committing a domestic battery, defendant knowingly caused bodily harm to V.S. in that he strangled her by intentionally impeding her normal breathing by applying pressure to her throat or neck.  We turn to the trial evidence, primarily the evidence relating to the sole issue on appeal.

¶ 5      V.S. testified on direct examination as follows.  On November 28, 2018, she and defendant resided in a second-floor apartment on Ashland Avenue in Aurora.  That evening, they were returning together from work.  As they entered the building, he complained that she had talked too much with the man who gave them a ride home and that she had ignored him.  Later, they shared a bottle of vodka—V.S. had a couple of shots and defendant drank the rest.

¶ 6      V.S. testified that she asked defendant to get something out of the refrigerator while she got ready to shower.  He responded angrily, took her phone from her, and threw it into the bathtub. She retrieved the phone, but he took it and threw it against the wall, breaking it into pieces. Defendant grabbed V.S. and forced her into the bedroom.  There, he closed the door and locked it. As she sat on a chair, he undressed her.

¶ 7      V.S. testified that defendant then held her down on the bed.  He "choked" her and held her "around [her] throat."  He said that he would kill her and nobody would find her.  The direct examination continued:

> "Q. So when you said he was choking you, what exactly was he doing?
>
> A. He had both his hands around my neck, and he had got me on the bed *** I couldn't breathe or talk.

Q. Did you try and fight back?

A. Yes, I was kicking him, kicking.

Q. Did you say anything to him as this was going on?

A. I couldn't.

Q. Did you try?

A. I couldn't breathe.

\* \* \*

Q. Now, you said that he was using both of his hands to strangle you and you couldn't breathe at the time, right?

A. Right.

Q. About how many times did that happen?

A. Just the—he just held me down for, like, awhile; and then he would let go just enough, because I was like—acted like I was passing out so he would stop. And he would let up a little bit, and then I would open my eyes and he would do it again harder.

Q. Did, at any point, you lose consciousness?

A. No. I pretended to so he would stop.

Q. But you said you had difficulty breathing?

A. Yes."

¶ 8    V.S. testified that, eventually, defendant got up. She got up and sat in the chair. Defendant went to the door. Before he left, he demanded some money that he believed V.S. had in her purse. He swung his foot at her and hit her in the mouth, chipping a tooth. She told him that the money was under the rug. Together, they left the apartment and went down the stairs. A woman and two men were coming in through the building's front door. V.S. could not hand the woman her

unfinished note, which she had started to write inside the apartment, so she instead asked her to call the police. The woman did nothing, but the two men stood in front of V.S. She pulled out a knife that she had taken from the kitchen, and the men backed away. Defendant ran upstairs and came back down, holding a can of mace. Somehow, V.S. got out the door and away from defendant.

¶ 9    V.S. testified that she ran into the parking lot between her building and another building on Ashland Avenue and screamed at a neighbor, Dylan Schopp, to call the police. Schopp took her into the hallway of the other building and called the police. They arrived shortly and spoke to her, then took her back to her apartment. Defendant was not there.

¶ 10    V.S. testified that a police officer took photographs of her. The photographs were admitted into evidence. They depicted injuries that she did not have before the incident. The first photograph was of her neck. V.S. testified that it showed bruising on both sides of the middle of her neck. It showed some red marks that resulted from defendant's attack, but "the officer said that [V.S.] was too dark or something, that they didn't see a lot that night." V.S. identified other photographs of (1) a scratch on her chest, (2) a bruise on her right arm, (3) scratches on her back, (4) her chipped tooth, (5) a photo of the knife she had brought from the apartment, and (6) a photo of the letter that she had started to write in the kitchen but had not completed.

¶ 11    V.S. testified that, shortly after the incident, she spoke to Aurora police officer Jonathan Flores. She told him that at one point, while she was still in the bedroom, defendant left, and she heard the patio door open. She also told Flores that defendant turned up the television very loud when he reentered the bedroom.

¶ 12    V.S. testified on cross-examination as follows. When she and defendant arrived home and entered the apartment, she put her coat onto a chair in the kitchen. Later, defendant took her phone

because she said that she would call the police. V.S did not recall whether she told this to Flores. She did not tell Flores that defendant broke the phone in his hands; she said he threw it against the wall. She did tell Flores that, while defendant held her down, she yelled at him to stop after defendant relaxed the pressure on her neck.

¶ 13    V.S. testified that the three people who entered through the building's front door were her neighbors, but she did not know their names. She had moved in only a few weeks earlier. She told Flores that only two people helped her, but she did not say that only two people were there. The neighbors lived in the unit across from V.S.'s apartment, but she did not tell this to Flores "[a]t the time." When the police arrived, she was in the hallway of Schopp's building, not the parking lot. On November 28, 2018, V.S. was on prescription medicine and was not supposed to consume alcohol when she took it. However, doing so did not affect her memory. On July 18, 2018, she might have told Detective Robert Hawco that combining her prescription medication with alcohol had a "horrible, horrible effect" on her. However, she was referring to a different drug, and its effect on her memory was why she had her prescription changed.

¶ 14    Schopp testified as follows. On November 28, 2018, he resided with his fiancée and daughter in the building adjacent to the parking lot on Ashland Avenue. At 7 p.m., he and his fiancée were walking from the parking lot to their building. When they got to the building, a woman and a man came up. The woman was screaming and appeared to be disoriented and distraught. She also appeared to be wearing nothing but a coat. She said that she was being held against her will. Schopp called 911 and brought the woman inside the building. He relayed the operator's questions to the woman, who was not screaming or crying as she answered. She did not appear intoxicated. No more than 20 minutes later, police officers arrived and Schopp spoke to them in the parking lot while the woman stayed inside with Schopp's fiancée. Schopp walked

back inside, introduced the police to the woman, and went to his apartment. He did not recall whether he saw any injuries on the woman.

¶ 15    Flores testified on direct examination as follows. V.S. and Schopp flagged him down from just across the parking lot. V.S. appeared shaken up, and there was a knife near her. Flores did not believe that she was under the influence of alcohol. Officer Arturo Montemayor arrived. Flores gave him V.S.'s description of defendant. Although it was chilly, V.S. appeared to be wearing nothing but a coat, and she confirmed that she had nothing underneath. Next, Flores and V.S. returned to her apartment. There, she showed him the small cuts on her back, some red marks on her upper chest, and her chipped tooth. Flores did not recall whether V.S. mentioned any other injuries.

¶ 16    Flores testified on cross-examination that the parking lot connected the two buildings on Ashland. V.S. and Schopp waved him down from the parking lot. Inside V.S.'s building, Flores knocked on the door across the hall from V.S.'s apartment, but no one answered, "[w]hich is not uncommon." Flores had no contact with the tenants who had encountered V.S. earlier. Asked whether he had seen any red marks on V.S.'s neck, Flores testified that he "notated [*sic*] some injuries, but *** left it to the follow-up officer *** to put it in her report." In his report, he did not state that he saw any injury to V.S.'s neck. When he spoke to her, she said that defendant broke her phone in his hands.

¶ 17    On redirect, Flores was asked why his report did not state that he had observed red marks on V.S.'s neck. He responded, "I must have forgotten to write them, to be honest; but I do on one side that I remember. It was only on one side." On re-cross, Flores testified that he did not follow up with the people in the apartment across from V.S.'s apartment. V.S. did not provide contact information for them, explaining that she did not know anybody in the building.

¶ 18    Montemayor testified that, after arriving at the incident area, he located defendant on Ashland Avenue, about two blocks away.  Initially, defendant gave Montemayor an incorrect name, but he soon gave him his real name.  Defendant said that nothing had happened.  He was cooperative and did not resist.

¶ 19    The State rested.  In defendant's case, Hawco testified that he interviewed V.S. on July 7 and 18, 2018.  In the second interview, she told him that her medicine and alcohol combination had a "horrible, horrible effect" on her and caused her to remember "only bits and pieces."

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt of aggravated battery based on strangulation.  Defendant does not argue that V.S.'s testimony, combined with the other evidence, was insufficient if credited.  However, he contends that, although credibility is generally the factfinder's prerogative, V.S.'s testimony was so inherently implausible that the jury could not reasonably have relied on it.  For the following reasons, we disagree.

¶ 22    In reviewing a challenge to the sufficiency of the evidence, we ask only whether, after viewing all of the evidence in the light most favorable to the prosecution, any rational factfinder could have found the elements of the offense proved beyond a reasonable doubt.  *People v. Ward*, 154 Ill. 2d 272, 326 (1992).  The factfinder is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence.  *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995).  It is not our prerogative to retry a defendant.  *People v. Lamon*, 346 Ill. App. 3d 1082, 1089 (2004).

¶ 23    " '[S]trangle' means intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual."  720 ILCS

5/12-3.3(a-5) (West 2018). V.S. testified straightforwardly that defendant intentionally applied pressure to her neck with both his hands and that, as a result, her normal breathing was impeded. She also testified that, as he applied the pressure, he told her that he would kill her. Viewed in the light most favorable to the prosecution, her testimony leaves no reasonable doubt as to defendant's acts, his intent, or the consequences of his acts. Thus, V.S's testimony was wholly sufficient.

¶ 24    Defendant, however, contends that V.S.'s account of the incident was contrary to human experience and lacked corroboration. Defendant makes several specific arguments.

¶ 25    First, defendant argues that V.S.'s conduct was inconsistent with her description of the incident. He reasons that, given that her testimony implied that she "would have been fighting for her life," she "would have kicked, punched, scratched, and *** used any manner of force available." Further, defendant argues, V.S would have screamed for help, at least "in between the chokings." Defendant argues that (1) V.S. did not testify to any such acts of resistance, (2) no neighbors testified that they heard her scream, (3) there was no evidence that the bedroom was in "disarray," and (4) after the choking ended, V.S. merely sat in the chair instead of fighting or grabbing something to protect herself.

¶ 26    Defendant's arguments are unpersuasive. None of the alleged weaknesses in V.S.'s account made it inherently implausible; indeed, none was particularly unusual. First, V.S. testified that she repeatedly kicked defendant. Plausibly, she did not use her hands because of her positioning relative to defendant. Also, attempting to hit defendant in the face might have appeared pointless, and V.S. soon rejected active resistance in favor of "playing possum," which she reasonably believed to be a better option. And, of course, the strangulation itself would have weakened V.S. and made physical resistance more difficult.

¶ 27    Further, that nobody testified to hearing her scream was not surprising.  There was no evidence that anyone else in the building was within hearing distance at the time; V.S.'s testimony implied that three of her neighbors, perhaps those who lived across the hall, were out of the building during the attack.  Flores testified that the neighbors across the hall did not respond to his knock on the door.  The jurors could use Flores' testimony and their common sense to conclude that, even if the neighbors were home, they might want to avoid a violent domestic dispute between two strangers.  Moreover, V.S. testified that she told Flores that defendant had turned up the volume on the television.  When V.S. was able to flee defendant outside, she promptly screamed to Schopp and told him what had happened.  Next, it means nothing that the bedroom was not in disarray, as the attack took place on the bed.  There was no reason to expect either defendant or V.S. to have disturbed the rest of the bedroom.  Finally, that V.S. did not attempt active resistance immediately after the attack is unremarkable: physical weakness, exhaustion, and the fear of further violence easily account for this fact.  Moreover, defendant ignores that V.S. put on her coat soon after the attack and inserted a knife into it for self-defense.

¶ 28    Defendant next argues that the physical evidence was fatally inconsistent with V.S.'s account.  He contends that the photographs did not show serious injuries to her neck and that Flores' police report did not note such injuries.  But these possible weaknesses were for the factfinder to evaluate.  The jury could examine the photographs in the context of the testimony. V.S. testified that an "officer" (either Flores or the officer who took the photographs) said that her skin was too dark to show the marks vividly.  Flores testified that he saw red marks on one side of her neck but forgot to note the fact in his report.  While the jury might have been skeptical of this testimony, it was not inherently implausible.  Strangulation, as defined by the statute, could have occurred without leaving obvious or extreme marks.

¶ 29    Defendant argues that V.S's testimony that defendant kicked her in the face so hard as to chip her tooth was inherently implausible, because the photographs did not show further facial injuries.  The short answer is that the kick to the face and the strangulation were wholly separate acts, making this problem tangential at best.  Further, photographs did show the chipped tooth, and, given where the kick landed, the lack of other marks to V.S's face meant little of importance.

¶ 30    Finally, defendant argues that Hawco's testimony undermined V.S.'s credibility. Defendant notes that, about four months before the events here, V.S. told him that taking her prescription drug with alcohol had a " 'horrible, horrible effect' " on her memory.  However, V.S. testified plausibly that, precisely for that reason, by November 28, 2018, the drug she had been on in July had been replaced by one that did not affect her memory.  Moreover, she testified that she drank little before the attack, and Flores and Schopp both testified that she did not appear intoxicated.  In any event, Hawco's testimony, even without these obvious weaknesses, raised no more than a credibility issue for the jury.

¶ 31    Defendant was proved guilty beyond a reasonable doubt of aggravated domestic battery. As he raises no other challenges to the judgment, we affirm.

¶ 32                                    III. CONCLUSION

¶ 33    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 34    Affirmed.