2025 IL App (2d) 240454-U
No. 2-24-0454
Order filed October 22, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 23-CM-872 |
| CLEO RECORD, | ) ) | Honorable Rene Cruz, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1     *Held*: At defendant's jury trial on the charge of aggravated assault with a deadly weapon (a knife), the State proved that defendant placed the victim in reasonable apprehension of a battery and that defendant did not act in self-defense. Specifically, the jury could reasonably find that defendant and the victim argued during a visitation exchange involving their child and that defendant became the physical aggressor, threatening the victim with a knife.

¶ 2     After a jury trial, defendant, Cleo Record, was convicted of aggravated assault with a deadly weapon (720 ILCS 5/12-2(c)(1) (West 2022)). The trial court imposed 12 months of court supervision. On appeal, defendant argues that she was not proved guilty beyond a reasonable doubt. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged that, on or about June 4, 2023, defendant committed aggravated assault with a deadly weapon in that, while armed with a knife, she placed Diandre Rhodes in reasonable apprehension of a battery.  We summarize the trial evidence.

¶ 5      Elizabeth Schmidt testified as follows.  On June 4, 2023, she spent the day with Rhodes and his two sons, K.R. (age 9) and H.R. (age 8).  K.R. was defendant's son, but H.R. was not.  At the time, Rhodes was Schmidt's boyfriend.  Late in the day, Schmidt, Rhodes, and the boys were at her home, waiting for defendant to arrive, pick up K.R., and drive him to her home in Gary, Indiana.  Schmidt was in her living room, which had large bay windows that allowed her to see the entire driveway.  Rhodes took both boys outside, but Schmidt remained inside.

¶ 6      Schmidt testified that, soon afterward, she heard a woman screaming and using profanity. Looking out the window, she saw defendant "in [K.R.]'s face screaming at him, calling him a liar." There were two cars in the driveway.  Rhodes, the boys, and defendant were standing between the cars.  Defendant took K.R. by the arm and "jerk[ed] him very forcefully towards her."  K.R. tried to pull away from her.  Schmidt could see that K.R. was "extremely uncomfortable."  Rhodes said, "[W]e're not doing this."  He then picked up K.R. and said he wanted the police to facilitate the exchange.  While holding K.R., and with H.R. clinging to his leg, Rhodes started walking back toward the garage, which was located directly under the living room.  Schmidt then saw defendant "come towards [Rhodes]."  Defendant "grabbed the back of [Rhodes's] head, yanked it, and *** [hit] him in the back of his head" three times while he held K.R.  In the process, defendant also hit K.R. in the face.  Schmidt never saw Rhodes hit defendant or pull out a gun or a knife that day.

¶ 7      Schmidt testified that, as Rhodes and the boys approached the garage, defendant went into her car.  Rhodes stood in place with the boys while defendant was in her car.  Defendant emerged

holding a knife, which was "iridescent" and "shiny." Defendant came toward Rhodes, holding the knife and "hitting it *** with her hand." She said something along the lines of " 'I'll f*** you up. Don't mess with me. Don't play with me.' " Defendant came to within a "few feet" of Rhodes and the boys, who then became "very nervous" and ran into the garage. Schmidt then called the police. She, Rhodes, and the boys waited together inside the house.

¶ 8    Schmidt testified on cross-examination as follows. As of June 4, 2023, she had been dating Rhodes for 3½ years. They broke up in November 2023. Defendant was K.R.'s primary custodian, and most exchanges took place in Gary. Schmidt accompanied Rhodes on several trips there. Many exchanges were tense. A few days before the incident, Schmidt was present when an Indiana trial court ruled in favor of defendant concerning the custody of K.R.

¶ 9    Schmidt testified that, on June 4, 2023, she did not go outside, because she thought it would be "an easy exchange." When Schmidt looked out the bay window, which was directly above the garage, she could see Rhodes and the boys underneath her. She could not remember whether she told the police officer at the scene that she heard defendant screaming in K.R.'s face and calling him a liar. However, she did give that account to the prosecutor the day before defendant's trial. Also, she both told the officer and the prosecutor that she (1) saw defendant grab K.R. and jerk him, (2) could see K.R.'s face and observed that he was uncomfortable, (3) saw defendant hit K.R. in the face, and (4) saw defendant yank Rhodes's head back and hit him.

¶ 10    Schmidt testified that, after defendant hit Rhodes in the head, he swung around and gave her "a stiff[-]arm," putting his hand up as a barrier as defendant approached him. Rhodes was holding K.R. at the time. Asked how close defendant got to Rhodes and the boys, Schmidt testified that it was approximately six feet. She "believe[d]" she told the officer that defendant told Rhodes, " 'I'll f*** you up.' " She was certain that she reported this remark to the prosecutor.

¶ 11    Schmidt testified that she had her phone with her during the incident.  The phone had a video recorder, but Schmidt did not use it to record any part of the incident.  There was no camera on the top of the house.  Schmidt watched the confrontation until Rhodes and the boys entered the garage, and only then did she call the police.  Asked why she waited, she testified, "I did not call the police.  I did not take my eyes off of what was going on."

¶ 12    On redirect examination, Schmidt testified that, aside from the stiff-arm, she observed no contact "from [Rhodes] to [defendant]."  Rhodes never used a weapon.  The only weapon involved in the incident was defendant's knife.

¶ 13    Rhodes testified as follows.  He was employed as a furniture mover.  On June 4, 2023, a Sunday, he was at Schmidt's house, awaiting defendant.  Rhodes had bought K.R. some toys, but the boy seemed hesitant to take them to defendant's home.  At about 5 p.m., defendant arrived.  Rhodes and the boys went outside and encountered defendant about 10 to 12 feet from the garage.  Defendant did not say anything about K.R.'s toys, but Rhodes broached the subject and told defendant that he did not want her "disposing of" K.R.'s toys.  Defendant then "yanked" K.R. away from Rhodes.  Rhodes "scooped" up K.R. and carried him toward the garage as H.R. also went that way.  Before they got there, Rhodes felt defendant hit the back of his head twice.  She hit him a third time, and that blow also grazed K.R.  At that point, Rhodes stuck out his free arm to keep defendant at a distance and defend K.R.  His hand made contact with her chest, and she backed off.  Rhodes and the boys entered the garage and lost sight of defendant.

¶ 14    Rhodes testified that, after he ensured the boys were safe, he stepped out of the garage to locate defendant.  He saw her getting out of her car, holding a knife.  The knife was "iridescent" and "kind of *** shined in the light with different colors."  When Rhodes noticed the knife, defendant was "[m]aybe about 15 feet" away from him.  As defendant "was walking up, she was

making gestures, making [the knife] visibly seen and swaying it, just making it known she ha[d] a knife on her." Defendant walked "rather swiftly" toward him, making "demonstrative gestures" with the knife, *i.e.*, slapping it as she held it in her hand. She "was also saying threats: 'I'm going to mess you up, you know, you don't—don't mess with me, you know, you're going to give me back [K.R.].' " Defendant came as close as five or six feet from Rhodes. He was "[p]retty angry, pretty terrified" for himself, the boys, and Schmidt. His adrenaline was "pumping," and he did not know how the situation would "play out." He thought that he was "going to get hit." Defendant had arrived with two young women in her car. Rhodes did not realize they were there until they exited the car and tried to "deescalate" defendant, which "didn't seem to work." After Rhodes and the boys went into the house, the police arrived.

¶ 15    Rhodes testified that, apart from the arm motion that made contact with defendant's chest, he never "attack[ed]" her that day. He was completely unarmed.

¶ 16    On cross-examination, Rhodes testified as follows. The garage was located underneath the first floor. A person inside the garage would not be visible to someone inside the house looking out the bay window. The front door of the house was about 10 feet from the garage, but he did not try to move himself or the boys inside the house, because defendant was "way closer" to the door than he was. However, Rhodes did not see defendant take any steps toward the front door. Rhodes acknowledged that, although defendant was "supposed to leave with [K.R.]" on June 4, 2023, Rhodes prevented her from doing so by taking K.R. from her and putting him first into the garage and later into the house.

¶ 17    Rhodes testified that, contrary to his testimony on direct examination, defendant did make a remark about K.R.'s toys when defendant initially approached Rhodes. Rhodes said he did not

mention that fact on direct because he "just didn't know it was that time to bring out that information."

¶ 18     Rhodes testified that the custody of K.R. was at issue in a pending case in Indiana. Two weeks before the trial in this case, defendant appeared before an Indiana trial court on Rhodes's motion to increase his "custody time" with K.R. The court denied the motion. Shortly afterward, Rhodes sought and obtained an emergency order of protection against defendant, listing himself and K.R. as protected parties. As a result, defendant could no longer have contact with K.R., even though she still had legal custody of him. Rhodes retained custody of K.R. for more than three months and relinquished it only when defendant obtained a modification of the protective order. Rhodes acknowledged that he had two pending cases in the Kane County circuit court.

¶ 19     Rhodes testified that, when he talked to the police officers at the scene, he might not have mentioned that defendant was about 15 feet from him at one point. He did not specify to the officers that, as defendant held the knife, she came to within about six feet of him. He told the officers that defendant threatened him, but he did not specify what she said. Within two weeks before trial, Rhodes had spoken with the prosecutor about this case.

¶ 20     On redirect, Rhodes testified that the State did not promise him anything in his pending cases in return for his testimony against defendant. As to K.R.'s toys, when Rhodes raised that issue with defendant, she told him it was none of his business. She also shouted at K.R. and called him a liar. Rhodes took the boys to the garage because it could be locked, while the front door to the house was open.

¶ 21     On recross-examination, Rhodes admitted that he did not tell the police officers specifically what defendant said about the toys, but he did tell them that they argued over the toys and that

defendant shouted at K.R. and told him not to call her a liar. The exchange on June 4, 2023, was the first one since Rhodes lost his custody case in the Indiana court.

¶ 22   David Fryer testified as follows. His property had two homes, about 200 feet apart. In June 2023, he lived in one of the homes, and Schmidt rented the other. On the evening of June 4, 2023, Fryer was looking out his home office's window, which overlooked Schmidt's house and driveway as well as a barn that he owned. Fryer saw a car and a woman, neither of which he recognized. He later identified the woman as defendant. Defendant was "screaming and shouting and acting aggressively" toward Rhodes, who soon came into view. Defendant "moved toward" Rhodes, and "there was some interaction between the two of them." Fryer could not make out what defendant was saying. Also present were Rhodes's two sons; one was with him, and the other went in and out of Fryer's view.

¶ 23   Fryer testified further that, as defendant approached Rhodes, he "appeared to be taking somewhat of a protective stance" toward the boy with him. Rhodes was "backing off, stepping back, kind of turning his head to the side *** like he didn't want anything to—he didn't want any part of it." Rhodes attempted to get his son behind his legs.

¶ 24   Asked who appeared to be the aggressor in the confrontation, Fryer testified, "[Defendant] was the aggressor." She came toward Rhodes angrily as he was backing away. As Rhodes backed up, he had his hands out in front of him and had turned his head to the side. He appeared not to want direct contact with defendant. She, however, was "shoulder to shoulder and appeared aggressive toward him[,] walking forward and continuing *** with the shouting."

¶ 25   Fryer testified that, after viewing the confrontation, he exited his house and went to his barn. He entered through a side door and emerged through the front door, which was just a few feet away from defendant, Rhodes, and the children. They all looked surprised by Fryer's sudden

appearance, and "all the action stopped." Defendant went out of Fryer's view. Fryer testified that he never saw Rhodes or defendant with a weapon and never saw him punch or tackle defendant. He believed that defendant was the aggressor based on her "posture," "voice," "[s]houlder movement," and "[b]ody language."

¶ 26     Eric Perkins, a Kane County sheriff's deputy, testified as follows. On June 4, 2023, at about 7:11 p.m., he responded to a call about a custody dispute at Schmidt's house. Deputy William Murphy responded separately. On arriving, Perkins was met by "the complainant [defendant] and two of her friends in a vehicle." Defendant informed Perkins of an argument that had arisen when she attempted to pick up K.R. and take him to Indiana. She said that the argument was over "the bringing of a toy." Defendant told Perkins that "she had been throwing out [K.R.'s] toys." Defendant added that, while she tried to grab K.R. from Rhodes, he "pushed her with his arm across her chest." Perkins saw no marks on defendant at that time, and she did not complain about any marks. When Perkins started speaking with defendant, she did not indicate whether she had been afraid of Rhodes or concerned for K.R.'s safety. She also did not initially indicate that she had a knife during the argument. Thereafter, "[a]t one point," defendant did say that she had used a knife in self-defense.

¶ 27     Perkins testified that he spoke to defendant's friends and Fryer, then entered the house, where he and Murphy spoke to Rhodes and Schmidt. Perkins exited the house and spoke with defendant. She told him that she had entered her car, retrieved a knife, and approached Rhodes with the knife. The officers took custody of the knife, and Perkins then arrested defendant for assault.

¶ 28     On cross-examination, Perkins testified that he saw a camera on the property and asked Rhodes and Schmidt about it. He did not review anyone's cell phone recordings. Inside the house,

he spoke to Rhodes and Schmidt in the living room, without separating them. Perkins asked Schmidt where she had been relative the confrontation outside. She indicated that she had been at the window that overlooked the driveway. Perkins testified that he initially could not tell who the initial aggressor was. Later, he arrested defendant for aggravated assault.

¶ 29 Perkins could not recall (1) Schmidt ever saying that defendant yelled at K.R. or called him a liar; (2) Schmidt ever reporting that she could see K.R.'s face or that he looked uncomfortable; (3) Schmidt ever saying that she saw defendant a few feet from Rhodes and the boys when she had the knife; (4) Schmidt ever reporting that defendant said, "I'll f*** you up," when she had the knife; (5) Rhodes ever telling him that defendant said, " 'Don't mess with me, and you're going to give back [K.R.].' " Perkins further testified that his report did not contain any of the foregoing remarks from Schmidt or Rhodes.

¶ 30 On redirect examination, Perkins testified that no surveillance videos were presented to him; "they advised [him] it wasn't working." On recross-examination, Perkins testified that he never separated Rhodes and Schmidt while speaking with them.

¶ 31 Murphy testified as follows. When he arrived at the scene, he saw Perkins speaking to defendant and two other women. The three women were yelling at Schmidt, and she was yelling at them. Shortly after the officers calmed everyone down, Perkins spoke to defendant, and Murphy followed up. Defendant told Murphy that she and Rhodes had argued and that a physical altercation had occurred. Defendant said she had been afraid for her safety. However, she did not refer to a knife or produce one. Perkins and Murphy then entered the house and spoke to Rhodes and Schmidt. Afterward, they exited the house and spoke again to defendant. Perkins asked about a knife, and defendant then indicated that she had one. She gave it to the officers.

¶ 32    On cross-examination, Murphy testified that it was only during the second conversation that defendant mentioned the knife. He did not recall any questioning about weapons during the first conversation. Once defendant was asked about the knife, she promptly produced it and said that "she was in fear."

¶ 33    The State rested.

¶ 34    Defendant testified as follows. At about 7 p.m. on June 4, 2023, she was sitting in her car in Schmidt's driveway, waiting for Rhodes and K.R. After about an hour, Rhodes and the boys came out of the house. Defendant exited her car and opened the trunk so she could stow the suitcase she had sent with K.R. As defendant put the suitcase into her car and closed the trunk, she heard Rhodes tell K.R. that he was not going with defendant. Defendant grabbed K.R. by the hand and started walking him to her car. Rhodes, who had gone back to take H.R. inside the house, returned and approached defendant rapidly. He grabbed K.R.'s other hand "to yank him the opposite way." He then picked up K.R. and put him on his hip. He told defendant, " 'I have a bone to pick with you.' " He asked her why she was throwing away K.R.'s toys. She responded that she and K.R. were simply giving away old toys to children who had none. She did not call K.R. a liar, because he was not lying.

¶ 35    Defendant testified that, after the argument over the toys, she reached to grab K.R.'s hand, as Rhodes had since put him down. Rhodes responded by grabbing defendant's breast and twisting it. It left a mark. Later, the officers took a photograph. Defendant identified the photograph and said that it showed that her breast had been squeezed. The photograph was admitted into evidence. Defendant testified that, after Rhodes attacked her, she pulled his hair to make him stop. Rhodes ran inside the house. Defendant started to walk to her car, but Rhodes emerged from the house and ran toward her. The car's doors were still open, as she had been preparing for her and K.R. to

enter the car. Defendant saw the knife that she had in the car. She grabbed it, turned around, and told Rhodes, "Don't come near me." K.R. was inside the house by then.

¶ 36    Defendant testified that, as Rhodes approached, she thought, " '[N]ot again,' " because Rhodes had been violent toward her before. In 2018, during a custody exchange at Rhodes's home in Bolingbrook, he choked her because she would not leave after his mother had invited her in. In 2022, Rhodes came to her house, attacked her, and refused to leave. She tried to film him on her cell phone's camera, but he knocked the phone out of her hand.

¶ 37    Defendant testified on cross-examination as follows. She did not attempt to "grab[ ]" K.R. to take him away; rather, they grabbed for each other. As the encounter evolved, she became frightened of Rhodes, but she did not want to leave without K.R. She admitted that, instead of running to the car and locking the door, she grabbed the knife. She screamed for help, but there were no neighbors to run to. She called the police immediately after she grabbed the knife. The knife was in her car because she routinely carried it for protection. After she emerged from her car with the knife, Rhodes was about 300 feet away, running toward her. She did not see him with any weapons.

¶ 38    On redirect examination, defendant testified that Rhodes ran at her but turned around when he was about 200 feet away. In previous violent encounters, he attacked her with his hands only. The parties rested.

¶ 39    In closing, defendant argued in part that her actions were justified by self-defense (see 720 ILCS 5/7-1 (West 2022)) because, by grabbing her breast, Rhodes became the aggressor. In response, the State pointed to testimony that Rhodes merely extended his arms and made contact with defendant. The State alternatively argued that, even if Rhodes made the contact defendant claimed, he thereafter backed away while defendant went to her car, took the knife in her hand,

and approached Rhodes. Therefore, the State argued, defendant did not defend herself against imminent contact but rather ignited a new confrontation. Hence, she was the aggressor and could not invoke self-defense.

¶ 40    The jury found defendant guilty, and the trial court imposed a 12-month term of court supervision. She timely appealed.

¶ 41                                    II. ANALYSIS

¶ 42    On appeal, defendant argues that she was not proved guilty beyond a reasonable doubt of aggravated assault with a deadly weapon. Specifically, she contends that the State did not prove all elements of the charged offense or disprove her affirmative defense of self-defense. For the following reasons, we disagree.

¶ 43    On a challenge to the sufficiency of the evidence, we ask only whether, viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. The fact finder, not this court, is responsible for determining the witnesses' credibility, weighing their testimony, and deciding the reasonable inferences to be drawn from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). It is not our function to retry the defendant, and we may not substitute our judgment for that of the trier of fact. *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 44    As charged here, a person commits aggravated assault with a deadly weapon when, without lawful authority, he or she knowingly engages in conduct that places another in reasonable apprehension of receiving a battery and uses a deadly weapon (720 ILCS 5/12-2(a), (c)(1) (West 2022)). Here, defendant contends that the State did not prove (1) that Rhodes was placed in

reasonable apprehension of receiving a battery or (2) that defendant did not act with lawful authority, *i.e.*, in self-defense.

¶ 45 We hold first that the State proved that defendant placed Rhodes in reasonable apprehension of receiving a battery. Viewed in the light most favorable to the prosecution, the evidence established the following. After a heated argument, Rhodes attempted to walk away from defendant. Defendant pursued and caught up to Rhodes, pulled his hair, and struck him in the head three times. Rhodes put out his arm to stop defendant, made contact with her chest, and walked back to the garage with the boys. After Rhodes exited the garage and stood near the door, defendant returned to her car and retrieved a knife—a deadly weapon, as she concedes—and approached Rhodes from a distance. As she walked rapidly toward him, she screamed profanity, repeatedly hit her hand with the knife for emphasis, and told Rhodes, "I'll f*** you up," which could reasonably be perceived as a threat of imminent violence. Rhodes started to back off and turn his head to the side. Defendant, however, approached within five or six feet of Rhodes. He attempted no physical contact with her, and he was unarmed. He was "pretty terrified" for himself, the boys, and Schmidt and did not know how the situation would resolve. To avoid physical harm to himself (and the boys), he retreated into the house. Soon, the police arrived.

¶ 46 From the foregoing summary, which accords proper deference to the jury's prerogative as fact finder, we conclude that the evidence was sufficient on the element of reasonable apprehension. The State proved beyond a reasonable doubt that, when defendant approached Rhodes, he reasonably expected her to physically strike him, given her previous pursuit and physical assault of Rhodes (pulling his hair to restrain him and repeatedly hitting his head); her renewed pursuit of Rhodes, who did not reciprocate and was unarmed; her possession and flaunting

of a knife; her threat of imminent physical harm; and Rhodes's testimony that he feared for the immediate safety of himself and his sons.

¶ 47 Defendant's argument on the reasonable-apprehension issue consists heavily, if not predominantly, of attacks on the credibility of the State's witnesses, based on their alleged biases.

¶ 48 First, defendant argues that Rhodes had reason to lie (1) to avoid being charged with an offense himself based on the confrontation; (2) to obtain lenient treatment in his two pending cases; and (3) to change the custody arrangement regarding K.R., which Rhodes had already attempted to modify through legal action and attempted to frustrate by refusing to hand over K.R. in the situation at issue here.

¶ 49 Second, defendant argues that Schmidt was not credible because (1) she had a lengthy dating relationship with Rhodes and during that time helped him to raise K.R.; and (2) she "harbored ill feelings" against defendant, based on her presence at prior custody exchanges and her yelling match with defendant and defendant's two friends after the incident.

¶ 50 Third, defendant argues that Fryer was biased because he was Schmidt's landlord and friend.

¶ 51 These challenges to witness credibility fail to raise a reasonable doubt. As the State points out, defendant simply ignores our standard of review and requests that, instead of viewing all of the evidence in the light most favorable to the prosecution, we arrogate the jury's prerogative to decide witness credibility. In effect, she invites us to retry her. We decline the invitation.

¶ 52 We turn to defendant's remaining arguments on the first issue that do not center on the alleged personal biases of the witnesses. She makes four such attacks on the evidence. We find them unpersuasive.

¶ 53    First, defendant argues that Schmidt was not credible because she testified that she witnessed "the altercation in the garage," (defendant's characterization), but Rhodes testified that the garage was not visible from the bay window.  Defendant simply misreads the record.  Schmidt testified about a confrontation that occurred outside the garage, not to any events inside the garage.

¶ 54    Second, defendant contends that Schmidt was not credible because she waited until the confrontation was over before she called the police.  We do not see how this alleged oddity required the jury to reject Schmidt's testimony even in part.  The jury could reasonably infer that (1) Schmidt wished to stay attuned to the confrontation in case she was needed to intervene or so she could describe the entire situation to the police or (2) Schmidt simply could not look away given the urgency and seriousness of the situation.

¶ 55    Third, defendant argues that Rhodes was not credible because he was the only witness who testified that defendant's two friends were outside the car with her during the confrontation.  Certainly, Rhodes was the only witness who expressly recalled that the two other women were outside the car during the confrontation.  However, none of the other eyewitnesses stated or implied that the women *did not* exit the car.  That those eyewitnesses would focus on Rhodes, defendant, and the boys—the main players in the confrontation—is understandable.  In any event, even if Rhodes lacked credibility on this point, it was tangential enough not to require the jury to disbelieve his testimony about the crucial events.

¶ 56    Fourth, defendant contends that Fryer was not credible because he never saw defendant wielding a knife.  However, Fryer's testimony was not needed to prove defendant's guilt beyond a reasonable doubt.  Even without it, the evidence still satisfied all elements of the charged offense.  Specifically, Fryer's testimony was not needed to prove that defendant was armed with a knife, because the other eyewitnesses to the confrontation, including defendant herself, testified that she

carried a knife. Also, Fryer's failure to observe the knife can be explained by the reasonable inference that he took his eyes off Schmidt's driveway while he came down from his office.

¶ 57 We hold that the State proved beyond a reasonable doubt that defendant's actions placed Rhodes in reasonable apprehension of receiving a battery. We turn to her remaining contention— that the State did not prove beyond a reasonable doubt that her actions with the knife were with lawful authority based on self-defense. Defendant relies on (1) her testimony that Rhodes grabbed and twisted her breast, which she claims was corroborated by the photograph admitted at trial, and (2) her testimony that defendant had threatened or attacked her in two confrontations in previous years. As we explain, defendant's argument is without merit.

¶ 58 Once a defendant raises the affirmative defense of self-defense, the State must prove beyond a reasonable doubt that the defendant did not act in self-defense. *People v. Lee*, 213 Ill. 2d 218, 224 (2004). The elements of self-defense are (1) that unlawful force was threatened against the defendant; (2) that the defendant was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the defendant actually and subjectively believed that a danger existed that required the use of the force applied; and (6) that the defendant's beliefs were objectively reasonable. *Lee*, 213 Ill. 2d at 225; see 720 ILCS 5/7-1(a) (West 2022). If the State negates any one of these elements, the defense must fail. *Lee*, 213 Ill. 2d at 225.

¶ 59 Here, viewing the evidence in the light most favorable to the State, we hold that the jury reasonably found that the State negated at least one element of self-defense. As to the first and third elements of the defense, the evidence established beyond a reasonable doubt that, when defendant brandished the knife, (1) unlawful force was not threatened against her and (2) she did not face an *imminent* danger of harm. The initial confrontation that led to Rhodes's contact with defendant's chest had ended. Defendant and Rhodes had separated. Rhodes testified that he had

come out of the garage merely to see where she had gone. By defendant's own admission, Rhodes was nowhere near her when he exited the garage. Schmidt, Rhodes, and Fryer all testified that Rhodes did not act aggressively at that time. Moreover, in light of this evidence, the jury could reasonably conclude that the alleged violence Rhodes had committed against defendant in 2018 and 2022 did not justify her actions in July 2023.

¶ 60     On the second element, the evidence established beyond a reasonable doubt that defendant was the aggressor. Schmidt, Rhodes, and Fryer all testified to defendant's aggression, and the jury could credit their testimony over defendant's testimony that Rhodes ran toward her. Turning to the fourth element, the evidence supported a finding beyond a reasonable doubt that defendant's use of force (or threatened use of force)[1] was not necessary. Defendant could have retreated to her car, locked the doors, closed the windows, and called the police. Finally, on the fifth and sixth elements, the jury could find beyond a reasonable doubt both that (1) defendant did not subjectively believe that she was in danger from a person who was 200 feet away from her but, instead, brandished the knife to persuade Rhodes to surrender K.R. to her and (2) even if she did subjectively so believe, the distance between her and Rhodes and the absence of any aggressive or threatening behavior on his part made that belief unreasonable. Thus, the jury did not need to decide even one element of self-defense in defendant's favor, much less all six.

---

[1]At neither the trial level nor in this court have the parties raised the potential issue of whether there is a legal distinction between the "use of force" referenced in the statute (720 ILCS 5/7-1(a) (West 2022)) and the *threatened* use of force present here. Since both parties have assumed that the self-defense doctrine applies to the threat to use the knife against Rhodes in a physical way, we need not resolve this question. In any event, it would not affect the substance of our decision.

¶ 61                                    III. CONCLUSION

¶ 62    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 63    Affirmed.