2025 IL App (2d) 240333-U
No. 2-24-0333
Order filed November 18, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CM-266 |
| BRIAN A. HENRICHS, | ) ) ) | Honorable Lisa F. Accardi, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices McLaren and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We reverse defendant's conviction of disorderly conduct where the State failed to show that defendant swerved his truck toward the victim as she stood along a roadway.

¶ 2    After a bench trial, defendant, Brian A. Henrichs, was found guilty of disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2020)) and was sentenced to six months' probation. On appeal, he contends that he was not proved guilty beyond a reasonable doubt. We reverse.

¶ 3                                    I. BACKGROUND

¶ 4    The State alleged by complaint that, on October 9, 2022, while driving south on Yorkville Road, defendant caused a breach of the peace when he "swerved his vehicle in the direction of Susan Tarnoki," who was standing with her dog near the roadway, and that, as a result, Tarnoki was "alarmed and disturbed" because she thought that the vehicle might strike her.

¶ 5    At trial, Tarnoki testified as follows. She resided on Riverside Street, a private road in Yorkville. Riverside Street is accessible via Yorkville Road, which is also a private road. Early on the afternoon of October 9, 2022, Tarnoki walked her dog on Yorkville Road. On her way home, walking south, she "heard [a truck] coming" behind her, also southbound. She recognized the truck as defendant's; he lived on Riverside Street. Tarnoki stepped aside onto "the grass at [a] house." She did so because defendant's truck "was just keep coming [*sic*] and swerving at [her]." It "[a]lmost hit [her]." The truck then passed Tarnoki.

¶ 6    Tarnoki testified that, as the truck came up behind her and passed her, she felt "intimidated." She testified further, "It was so close to me, inches, and I thought I'm gonna die because they were so close to me and they gonna hit me or they gonna hit my dog." It did not appear to her that the driver tried to slow down or stop before passing her. Tarnoki saw that defendant was driving the truck. She did not know where the truck went after it passed her.

¶ 7    Tarnoki testified that she called the sheriff's department and spoke with a deputy. Afterward, she viewed two videos of the incident, which were taken by her neighbor's surveillance equipment. The videos were played in court and admitted into evidence as People's exhibits No. 1 and No. 2, respectively.

¶ 8    People's exhibit No. 1 is one minute and 16 seconds. As the trial court observed, the counter on the video recorder runs faster than the counter on the video player. The action appears to have been recorded, or re-recorded, at roughly 1.5 times normal speed. The camera provides a

slightly elevated perspective from the west. The video shows Tarnoki walking with her dog south on the far (east or left) side of Yorkville Road. At the six-second mark, she looks back over her right shoulder and begins to walk slightly faster. At the 15-second mark, she passes behind a bush that is between the camera and the road, partially blocking the view of Tranoki, but her silhouette is visible. She stops while behind the bush and is still stopped when, at the 25-second mark, a truck enters the frame from the north. The truck passes behind the bush (while Tarnoki is still stopped), emerges on the other side, and leaves the frame from the south. As the truck approaches the area behind the bush, it is roughly in the center of the road. When it emerges from behind the bush, it is still roughly in the center of the road.

¶ 9　　People's exhibit No. 2 is 11 seconds and plays at normal speed. It, too, was recorded from the west but from a position farther south than the camera that recorded People's exhibit No. 1. There is no bush between Tarnoki and the camera. When the truck approaches Tarnoki, her back is to the road. Neither she nor her dog moved as the truck approached and passed them.

¶ 10　　Asked how far onto the grass she was when defendant's truck passed her, Tarnoki testified, "Maybe a feet [*sic*]." The truck did not move over to give her more space; rather, "[h]e tried to hit [her]." Tarnoki was "alarm[ed]" "because [defendant] came down so fast." The truck came to within a "[m]atter of feet" of her, scaring her.

¶ 11　　On cross-examination, Tarnoki testified as follows. As best she could recall, the incident happened "around 1:00 or 1:30, something like that." She did not have her cell phone while she was walking. On arriving home, she immediately called the sheriff's department. After speaking with the deputy, Tarnoki called a neighbor and learned of the neighbor's surveillance videos. The next day, Tarnoki watched the videos.

¶ 12    Tarnoki acknowledged that the time stamp "in the upper right-hand corner" (*i.e.*, the counter on the video recorder) of People's exhibit No. 1 showed that the video was taken at "11:39 a.m." She said that the incident probably happened at "11:30, 12:00, something like that." Tarnoki did not remember what time she called the sheriff but thought that the police report would record it. The parties stipulated that the report identified 1:37 p.m. as the time of Tarnoki's call.

¶ 13    Tarnoki testified that, even before the truck came down the road, and was still "far away" from her, she felt intimidated "[b]ecause the truck was so loud and they always flying [*sic*] on the road going so fast."

¶ 14    Tarnoki stated that, when the truck passed her, she was facing the road. Tarnoki was shown Defendant's exhibit No. 3, which she identified as a photograph of her on Yorkville Road, just after the truck had passed her. She admitted that the photograph showed her standing with her back to the road. She explained that she faced the truck until it passed, and then she turned around.

¶ 15    Tarnoki testified that she specifically told the 911 operator that defendant "swerved" his truck toward her. The 911 recording was then played in court solely for impeachment. Asked if she "never actually told the 911 operator that [defendant] swerved at [her]," Tarnoki testified, "I think I did." The 911 recording is not in the record on appeal.

¶ 16    According to Tarnoki, Yorkville Road is one-lane and two vehicles cannot fit on it side-by-side. As the truck passed, the windows were open and she heard both occupants, defendant and a woman, laughing at her. The State rested.

¶ 17    Defendant testified as follows. He first learned of the disorderly conduct charge two or three weeks after the incident. He then reviewed still photographs taken by surveillance cameras on his property. The trial court admitted Defendant's exhibit No. 3. Defendant testified that the photo was taken at about 11:30 a.m. on October 9, 2022. The photo was taken from the west, at a

slight elevation. In the photo, Tarnoki and her dog are standing on the far (east or left) side of the road, about a foot onto the grass, with Tarnoki's back to the road; defendant's truck has passed them and is a few yards to the south. The truck appears to be roughly in the center of the road.

¶ 18    Defendant recalled that, consistent with the photo, Tarnoki's back was to the road when he passed her. Yorkville Road ranged from 12 to 13 feet wide in the area of the incident. Defendant's truck was six feet wide.

¶ 19    Defendant testified that his speed was in the "[m]id 20's" when he passed Tarnoki. As he approached Tarnoki, he was 400 feet from a 90-degree turn, which he could not have traversed "faster than 15 miles an hour, otherwise [he would] be going off the road." He never swerved toward Tarnoki but remained "on the right-hand side of the road."

¶ 20    On cross-examination, defendant testified that no other vehicles were on the right-hand side of the road in the area of the incident. According to defendant, in Defendant's exhibit No. 3, his truck was a foot and a half from the right edge of the road. When he first saw Tarnoki, she was about 200 feet down the road and "three or four feet off the road" on the grass. When defendant passed, his truck was "probably five feet away from the left-hand side of the road that *** Tarnoki was on." Defendant was trying to stay "[a]s far right as possible." He was traveling about 25 miles per hour. He did not speed up as he approached Tarnoki but could not recall whether he slowed down.

¶ 21    Kendall County sheriff's deputy Angerame (first name not given) testified as follows. On October 9, 2022, at 1:47 p.m., he received a dispatch call and spoke to Tarnoki. He continued:

"Q. Do you recall if Ms. Tarnoki ever specifically told you that [defendant] swerved his truck at her?

A. She said—yes.

Q. Did she specifically say [defendant] swerved his truck?

A. I don't remember her exact wording but it was to that effect.

Q. But it was all then recorded on your body cam?

A. Yes.

Q. Isn't it true actually that you were the one that told [*sic*] her did he swerve at you?

A. I was trying to clarify what she was meaning.

Q. All right. So you in fact said did he swerve at you, correct?

A. Yes.

Q. All right. And she never offered that and said [defendant] swerved his truck at me. That came from you—

A. Yes."

¶ 22 On cross-examination, Angerame testified that Yorkville Road had no posted speed limit. Two vehicles could not drive side-by-side. According to Angerame, People's exhibit No. 1 showed that there was room on the right-hand side of the road for defendant to move farther away from Tarnoki.

¶ 23 Defendant rested.

¶ 24 After hearing closing arguments, the trial court stated as follows. People's exhibit No. 1 showed that Tarnoki initially looked over her right shoulder at the approaching truck and continued walking her dog. Tarnoki passed a tree, stopped, looked back again, and moved onto the grass "approximately two to three feet to her left." At this point in People's exhibit No. 1, "defendant's blue truck *** [could] be seen from the left side of the frame of the video starting to come down that roadway." Tarnoki testified that defendant "swerved" at her, making her fearful that he would

hit her or her dog. Tarnoki also testified that, even from her position on the grass, the truck was so close that she could see that defendant was driving.

¶ 25    The trial court found that Tarnoki's testimony was not impeached by the 911 call merely because she did not use the word "swerve[ ]." What Tarnoki told Angerame (according to his testimony) was consistent with her trial testimony.

¶ 26    The trial court remarked that, although the two counters in People's exhibit No. 1 moved at different speeds, the court did not believe that the video had been manipulated. The court continued:

"[T]he court is not relying on the speed of the vehicle. The road does not have a marked speed limit. [Defendant] is not charged with speeding.

What's at issue is whether or not the positioning of his vehicle, how he was driving it, where it was on the road, what actions he may or may not have taken relative to the fact that [Tarnoki] was scared for her safety, scared for her dog's safety, and was alarmed and disturbed ***."

The court found Tarnoki "credible *** with regard to the events as they occurred that afternoon and how she felt at the time."

¶ 27    The trial court noted defendant's testimony that he drove only "about a foot or two from the right side of the roadway." The court described the action on People's exhibit No. 1:

"[A]s soon as [defendant's] vehicle comes into the frame, he is at best in the middle of the roadway, and although obviously there's no specific measurements, by all of the witnesses' testimony, by defendant's own testimony, that this roadway is only 12 to 13 feet wide, he is certainly more than only one to two feet from the right side of the road when his vehicle first comes into the frame.

Ms. Tarnoki's testimony is corroborated by the fact that the court sees her stop, she's behind a bush in the video, that she actually stops, moves off the roadway onto the grass approximately a foot or two with her dog, and then as the defendant's vehicle is passing her, the court is able to observe that he's actually closer to the left side of the roadway than when *** his truck first entered the frame on the right side of the video ***. So he is now at least approximately four to five feet from the right side of the roadway, making him not only in the middle of the road, but actually more farther [*sic*] towards the left side of the road where Ms. Tarnoki is located."

¶ 28 The trial court noted that defendant had testified that he could see Tarnoki from 200 feet away and did not claim that a tree hid her. The court continued:

"I do not think that there is a requirement that he slow down. Again, this is not in relation to the speed. It is for the court where [*sic*] his vehicle was positioned knowing that he saw Ms. Tarnoki on the side of the road to the point that she had moved off the roadway and he operated his vehicle in a position that the witness testified credibly that he was within a foot or two of her on the left side of the roadway.

Again, the court can see on the video that [defendant] is not operating as close to the right side of the road as he can. He comes down the middle of the road and actually maneuvers more towards the *** left side of the roadway as I observed in the video.

Based on that specific maneuvering and the observations on the video, as well as the witnesses' testimony, as well as [Tarnoki's] testimony about how she felt that day when she was simply walking in the middle of the day down the side of the road in the neighborhood she lives in with her dog, I am making a finding of guilty for [*sic*] disorderly conduct."

¶ 29    The trial court denied defendant's posttrial motion and sentenced him to six months' probation. He timely appealed.

¶ 30                                II. ANALYSIS

¶ 31    On appeal, defendant contends that he was not proved guilty beyond a reasonable doubt of disorderly conduct. As charged here, a person commits disorderly conduct when that person "knowingly *** [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace[.]" 720 ILCS 5/26-1(a)(1) (West 2020).

¶ 32    On a challenge to the sufficiency of the evidence, we ask only whether, viewing all of the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. The fact finder, not this court, is responsible for determining the witnesses' credibility, weighing their testimony, and deciding on the reasonable inferences to be drawn from the evidence. *People v. Hill*, 272 Ill. App. 3d 597, 603-04 (1995). We do not retry the defendant, and we may not substitute our judgment for that of the trier of fact. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). Nonetheless, if, after due consideration, we conclude that the evidence is not sufficient to establish defendant's guilt beyond a reasonable doubt, then it is our duty to reverse the judgment. *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001).

¶ 33    "To prove [a] defendant guilty beyond a reasonable doubt of disorderly conduct, the State had to prove that [the] defendant 'knowingly' committed an act in an unreasonable manner that he 'knew or should have known' would tend to alarm or disturb another so as to cause a breach of the peace." *People v. Swenson*, 2019 IL App (2d) 160960, ¶ 18 (quoting *People v. Raby*, 40 Ill. 2d 392, 397 (1968)). What is "unreasonable" for purposes of the disorderly conduct statute depends on the circumstances of the particular case. *People v. Douglas*, 29 Ill. App. 3d 738, 742 (1975).

¶ 34    We agree with defendant that, when viewed in the light most favorable to the prosecution, the evidence did not prove beyond a reasonable doubt that he acted in an unreasonable manner *and* that, in doing so, he knew or should have known he would alarm or disturb Tarnoki so as to cause a breach of the peace.

¶ 35    The trial court found Tarnoki credible, but—in crucial respects—the video and photo evidence fails to support, and even refutes, her recollection of the events. People's exhibit No. 1 shows that, before defendant's truck entered the frame from the south, Tarnoki looked back (south) over her right shoulder and started walking a little faster. There is no evidence that, at this point, defendant was driving unreasonably. To be sure, Tarnoki testified that, even while the truck was still distant, she felt intimidated "[b]ecause the truck was so loud and they always flying [*sic*] on the road going so fast." However, in finding defendant guilty, the trial court placed no weight on either the alleged loudness of the truck or its speed. Indeed, Tarnoki's complaint about loudness would be a weak basis for finding anything more than justified annoyance. Her complaint about the speed of drivers generally ("they") on the road is inapposite, though we recognize that she also testified that *defendant* "came down so fast" as he passed her. There was no posted speed limit. Defendant testified that he traveled about 25 miles per hour, which, given the surroundings, would have been a reasonable speed. The videos are inconclusive on defendant's speed.

¶ 36    In any event, the trial court made no findings on speed because the gravamen of the complaint was the "positioning" of defendant's truck: the State alleged that defendant "swerved" toward Tarnoki as he passed her. She testified that defendant came within "inches" (she also said "feet") of her and "tried to hit [her]." The court largely accepted her testimony, finding that defendant "maneuver[ed]" his truck toward Tarnoki and that the motion alarmed her and made her fear that the truck would hit her.

¶ 37    However, the video and photo evidence directly contradicts Tarnoki's testimony about the alleged movement and position of the truck and her reaction. First, as to the truck's position, Defendant's exhibit No. 3—the photo—shows that, immediately after the truck passed Tarnoki, the truck was roughly in the center of the road. Given that the road was 12 to 13 feet wide, defendant's truck was six feet wide, and Tarnoki was a foot off the edge of the road, defendant would have been a reasonable distance (roughly three to four feet) from Tarnoki if he remained in the center of the road. The possibility that defendant was closer to the left side of the road when he passed Tarnocki and then immediately swerved toward the center (and became positioned as shown in Defendant's exhibit No. 3) is undercut by People's exhibit No. 1, which shows that the truck was roughly in the center of the road both before and after it passed behind the bush. A finding that defendant "swerved" or "maneuver[ed]" toward Tarnocki simply cannot be reconciled with the video and photo evidence.

¶ 38    Second, Tarnoki's ability to judge the position of the truck as it passed was seriously challenged. Defendant's exhibit No. 3 shows that Tarnoki's back was to the road immediately after the truck passed her. Shown this exhibit, Tarnoki explained that she turned her back to the road once the truck passed. However, People's exhibit No. 2 plainly depicts Tarnoki with her back to the road as the truck approached until after it passed her. Facing away from the road, Tarnoki was in no position to observe the truck's distance from her, nor whether defendant "swerved."

¶ 39    Third, even if Tarnoki could discern the truck's distance from her as it passed, the video evidence shows no bodily movements suggestive of alarm. Specifically, People's exhibit No. 2 shows Tarnocki standing in place while the truck passed. This was not the reaction of one who believed she was "gonna die" because a truck passed within "inches" of her as its driver "tried to hit [her]."

¶ 40　　Thus, viewing the evidence in the light most favorable to the prosecution, we find a reasonable doubt of defendant's guilt. The State did not prove that defendant drove "in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace[.]" 720 ILCS 5/26-1(a)(1) (West 2020).

¶ 41　　　　　　　　　　　　　III. CONCLUSION

¶ 42　　For the foregoing reasons, we reverse the judgment of the circuit court of Kendall County.

¶ 43　　Reversed.